MICHAEL K. PORTER, OSB No. 211377
Sr. Deputy City Attorney
mike.porter@portlandoregon.gov
ELIZABETH C. WOODARD, OSB No. 075667
Sr. Deputy City Attorney
beth.woodard@portlandoregon.gov
Portland City Attorney's Office
1221 SW 4th Ave., Rm. 430
Portland, OR 97204
Telephone: (503) 823-4047
Facsimile: (503) 823-3089
*Counsel for Defendant City of Portland*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

**PORTLAND DIVISION**

| | |
|---|---|
| **JESUS VELEZ PASTRANA** and **JOHN G. IRWIN JR.,**<br><br>Plaintiffs,<br><br>v.<br><br>**CITY OF PORTLAND**, a municipal corporation, **JOSEPH GARY SUMNER**, an individual, **SHAUN LEE PALMER**, an individual, and **JOHN** or **JANE DOE**, an induvial,<br><br>Defendants. | **Case No. 3:24-cv-00587-AB**<br><br>**DECLARATION OF MICHAEL K. PORTER**<br><br>**(In Support of Defendant City of Portland's Motion for Summary Judgment)** |

I, Michael K. Porter, declare as follows:

1. I am the Senior Deputy City Attorney with the Portland Office of City Attorney assigned to represent Defendant City of Portland in this case.

2. I make this declaration in support of Defendant City of Portland's Motion for Summary Judgment.

3. Attached to this declaration as **Exhibit 1** are true and correct copy of excerpts of Jeffrey Elias's January 28, 2025 deposition transcript.

4. Attached to this declaration as **Exhibit 2** are true and correct copy of excerpts of Joseph Sumner's February 20, 2025 deposition transcript.

5. Attached to this declaration as **Exhibit 3** are true and correct copy of excerpts of Joseph Sumner's March 21, 2025 deposition transcript.

6. Attached to this declaration as **Exhibit 4** is a true and correct copy of the April 29, 2022 video from Portland Police Bureau's airplane, AIR1.

7. Attached to this declaration as **Exhibit 5** are true and correct copy of excerpts of Quincy Ho's January 28, 2025 deposition transcript.

8. Attached to this declaration as **Exhibit 6** are true and correct copy of excerpts of Susannah Badger's February 25, 2025 deposition transcript.

9. Attached to this declaration as **Exhibit 7** are true and correct copy of excerpts of Carole Blake's March 14, 2025 deposition transcript.

10. Attached to this declaration as **Exhibit 8** are true and correct copy of excerpts of Ryan Hernandez's January 28, 2025 deposition transcript.

11. Attached to this declaration as **Exhibit 9** is a true and correct copy of Porland Police Bureau's Vehicle Interventions and Pursuits Directive 630.05 in effect April 29, 2022.

12. Attached to this declaration as **Exhibit 10** is a true and correct copy of Officer McCageor Byrd's 2022-113627 Follow-up Report #17.

13. Attached to this declaration as **Exhibit 11** is a true and correct copy of the July 11, 2023 Judgment entered in *State of Oregon v. Joseph Gary Sumner*, Case No. 22CR49538.

///

///

///

///

///

///



PORTLAND CITY ATTORNEY'S OFFICE
1221 SW 4TH AVENUE, RM 430
PORTLAND, OREGON 97204
(503) 823-4047

14. Attached to this declaration as **Exhibit 12** is a true and correct copy of a photograph of the subject box truck.

**I hereby declare that the above statement is true to the best of my knowledge and belief, and that I understand it is made for use as evidence in court and is subject to penalty for perjury.**

DATED: July 31, 2025

*/s/ Michael K. Porter*
Michael K. Porter



PORTLAND CITY ATTORNEY'S OFFICE
1221 SW 4TH AVENUE, RM 430
PORTLAND, OREGON 97204
(503) 823-4047

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | | |
|---|---|---|
| Jesus Velez Pastrana, and John G. Irwin Jr., | ) | |
| Plaintiffs, | ) | |
| vs. | ) | Case No. 3:24-cv-00587-AB |
| City of Portland, a municipal corporation, Joseph Gary Sumner, an individual, Shawn Lee Palmer, and John or Jane Doe, an individual, | ) | |
| Defendants. | ) | |

ZOOM DEPOSITION

of

JEFFREY ELIAS

January 28, 2025

scene?

A. Well, that's kind of fluid, so it changed. It changes as the call goes on. I don't know how many were there exactly and when.

Q. Okay.

A. Early on I saw a couple of cars but I'm sure more cars showed up later.

Q. So when the spike strips were deployed, do you recall how many officers were there?

A. I can't recall.

Q. Do you recall if there was an officer on the -- I'm going to use one exit, so -- okay. Scratch that.

Do you recall seeing the vehicle at Tom's Diner?

A. Yes. That's the parking lot on the -- the north -- the northwest corner?

Q. Right. Do you recall if there was an officer on either exit?

A. I recall that there were some officers on one of the exits, I believe it was on 39th, but I can't recall exactly, it might have been on Division.

Q. Do you recall -- there's a little feedback.

A. That didn't come through. I didn't hear what you said.

Q. Do you recall where the officer was that threw

MR. WALLACE: Yeah.

THE WITNESS: Yeah. Can you ask it again?

Q. (By Mr. Wallace) So at the time of the incident, what was the policy?

A. At the time of the incident that was just a stolen car so it's not going to be pursued.

Q. It's not going to be pursued but it will be spiked?

A. Yes.

Q. Why was it not pursued?

A. Because it was just a stolen vehicle. Portland police policy we can't pursue a vehicle just for being stolen.

Q. What would have necessitated a pursuit?

A. Do you want me to give a hypothetical --

Q. Sure.

A. -- of a vehicle we would pursue? If there was a homicide suspect in the vehicle and it was stolen, it would be pursued.

Q. And in terms of this particular case, what knowledge did you have about the occupant of the vehicle?

A. I didn't have any knowledge of the driver of the vehicle.

STATE OF OREGON )
) ss.
County of Yamhill )

I, Karen Edwards, a certified shorthand reporter for Oregon, hereby certify that, pursuant to the stipulation of counsel for the respective parties hereinbefore set forth, JEFFREY ELIAS appeared via Zoom before me at the time and place set forth in the caption hereof; that at said time and place I reported in Stenotype all testimony adduced and other oral proceedings had in the foregoing manner; that thereafter my notes were reduced to typewriting under my direction, and that the foregoing transcript constitutes a full, true and accurate record of all such testimony adduced and oral proceedings had, and of the whole thereof.

WITNESS my hand at McMinnville, Oregon, this 8th day of February, 2025.




Karen Edwards
Certified Shorthand Reporter
Certificate No. 90-0145

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | | |
|---|---|---|
| JESUS VELEZ PASTRANA and JOHN G. IRWIN, JR., Plaintiffs, | ) | |
| vs. | ) | 3:24-cv-00587-AB |
| CITY OF PORTLAND, a municipal corporation; JOSEPH GARY SUMNER, an individual; SHAUN LEE PALMER, an individual; and JOHN or JANE DOE, an individual, Defendants. | ) | |

VIDEO-RECORDED DEPOSITION OF JOSEPH GARY SUMNER

Taken on Behalf of Defendant City of Portland

February 20, 2025

BE IT REMEMBERED that, pursuant to notice and the Federal Rules of Civil Procedure, the deposition of JOSEPH GARY SUMNER was taken before Susan G. Walker, an Oregon Certified Shorthand Reporter, on Thursday, the 20th day of February, 2025, commencing at the hour of 9:00 a.m.; the witness responding to questions via videoconference from Ontario, Oregon; the questions propounded and proceedings reported remotely via videoconference.

you know, you don't want to smell like, you know, garbage. You know, you realize. You come to realization. So I was able to get away from it multiple times. But then, you know, certain triggers, people, places and things would trigger. You know, I realized that there were actually 10:31:04 traumas from when I was, like, 15 and 16 years old that I had suppressed for many years up until -- you know, as of the past few years I've been recognizing those traumas and realizing that those are -- you know, not having dealt with the toxicity of them, I just had too much emotion 10:31:28 that I would deal with. So certain people, places and things would lead me to be faced head-on with emotions that I was never really prepared or had the skills how to deal with. And that's basically the foundation for my drug use. 10:31:49

And so once I would get high, my actions, they're indecisive. The neurotransmitters, they just react without thought.

Q Okay. Thank you for that answer.

Can I ask you a follow-up on that. Do you think 10:32:11 that your drug addiction had anything to do with what happened that day of the accident?

A I do.

Q Can you tell me more about that.

A I was high on meth. It creates paranoia. After 10:32:24

not sleeping for days at a time, just, you know, the neurotransmitters, they react, and actions happen without thought. There's no contemplation.

And, yeah, I had been using meth for almost 12 years off and on up until that point, which is the longest stretch that I had. I started using again in 2012 after more than 12 years sober, away from them. 10:32:59

And it was trauma that I'm still dealing with that happened. It had to do with my wife and my kids. Some things happened. And I felt like the right thing to do was to sign a paper for adoption for my kids, which led me to -- every time I would think of my kids, I would do a shot of meth, because I just didn't know how else to cope with the pain, with the trauma of knowing what my kids were going through. And I just felt like -- and their position, that they were in a better situation than the situation that they would have been in under the care of my ex-wife and I, who were going through -- basically she found meth. 10:33:20 10:33:45

She was from New York. They don't have it out on the east coast. There's no such thing on the east coast. And so for somebody who -- she had, like, severe trauma. She suffers from a disorder called oppositional defiance disorder, which is -- it's the most vicious psychosis that I've ever seen in another human being. And 10:34:03 10:34:24

I found her in Lents Park wearing high heels and a mini skirt. And I said, okay, this is not what our kids need to be aspiring to at this point. And I let them go, and I followed her. There was a song that I just was listening to by Shinedown called I'll Follow You Down. And I was 10:34:45 hoping that, by being there, that she would get through it. And that's not what happened.

She did -- well, she did eventually. She's clean now. But, yeah, there's no doubt that, that day, to get to the question that, you know, I was in a 10:35:03 psychotic frenzy, and that, you know, I was paranoid. I hadn't slept for -- usually, it was basically the only time I would sleep, it was kind of like a narcoleptic thing. The lifestyle that I was living at that point was in stolen vehicles, on drugs. 10:35:30

And I just had no -- I mean, if you look at the picture of me from that day, the minute I was arrested I felt the greatest relief. I felt like there was a whole world of shame, guilt, people that only just want to take from you. It was all lifted off of me. I just felt like 10:35:51 I had been rescued that day that I was arrested, which was actually eight months later.

But pertaining to that day, there's no doubt that it was my drug abuse that was the cause, you know; my neurotransmitters just reacting without thought that 10:36:10



www.LNScourtreporting.com

led to all the damage that happened that day.

And I can't hold any of the police who were doing their jobs accountable for that. I don't -- you know, I'm not a victim. The police are not the victims. You know, it wasn't the first time that something like that happened, as you guys know. I'm sure that that question may have been brought up further along in this process. 10:36:33

It was out there. It was anarchy at the time in the City of Portland. And my drug abuse just was way out of control. Way out of control. 10:36:49

Q I appreciate you sharing that. I want to go back to a couple of things you shared there. It sounded like you had been using methamphetamine for several days before you encountered the police, and that's why you weren't sleeping. Did I understand that correctly? 10:37:09

A Yes.

Q And it sounds like during this period -- and I have seen the criminal record, so I was going to ask, so I appreciate that -- but it sounds like, to me, the lifestyle was methamphetamine use and stealing cars. Is that correct? 10:37:21

A Not so much stealing cars as living in them.

Q Oh, okay.

A I wasn't the greatest -- I wasn't really good 10:37:38



www.LNScourtreporting.com

A You know, I really don't know. I know that at the time I was just all over the place. I mean, those few days, that time period, it's hard to remember what I did in that time. I mean, I don't really remember a lot from that period. 10:40:30
Q Do you remember driving to Tom's?
A Tom's Bar?
Q Yeah.
A Yeah. I do.
Q What do you remember just before that? Like, 10:40:47 just go back, like, an hour. You said it's kind of a mixed memory. So I just want to kind of get an idea of what you remember.
A Well, I remember that I was trying to use the phone. I was trying to use WiFi somewhere. And I pulled 10:41:04 up by a Plaid Pantry. And when I did, the guy that -- there was a guy in the truck, and he went in and he stole something out of the Plaid Pantry. So I kind of freaked out on him about it. And I was like, man, what the hell are you doing, man? Come on, you know. You know we're in 10:41:35 kind of a G ride, so to speak. Why would you do that? So I went to Tom's.
Q What's a G ride? Sorry. I don't know these terms. What's a G ride?
A A stolen vehicle. 10:41:50

So you won't be charged criminally again, but you said this is really hard for you. Is the criminal prosecution the only thing that's making it hard for you to talk about this today?

A Not just that. It's I love Portland. And, like I said earlier before we started this, is that I just don't want to, like, incriminate any of the cops that did their job that day. What I did was a poor decision. It was a bad decision that I made, and a quick response to a situation that I ultimately could have had a better control over had I just not decided to do what I did that day and drive off from Tom's Bar. 10:47:49 10:48:18

I do remember, back to a question you asked me about three questions ago, before we get back to that minute at Tom's, is that I do remember we were sharing that truck for a few days, the guys that I got it from. Because I remember I only had a little bit, and a few bucks, and then ultimately we were trying to sell it for more because it was like -- it was a nice truck. And some guy said he could get something offline and make it legal or something like that. And, like, so -- but yeah. So, I mean, I had it off and on for a couple of days. 10:48:40 10:49:02

But back to Tom's, the passenger got out, he went inside for a minute, and he came out. He said, hey, man, there are police on the side of the building, we need 10:49:25

to get out of here. And I went to back up and go around back onto Division, and when I did, I seen the officer, and it was very cartoon -- it was almost reminded me of, like, a cartoon. I was just so out of it that I seen him, and then I went and tried to go back out the other side, as the video would show. I remember that much. 10:49:49

And forgive me for, you know, not remembering some of the activities that happened the few days prior. But in that instance, you know, it was a flash. It was like, okay -- excuse my language -- but, oh, we'd better go. 10:50:08

I do remember seeing him roll out what I believe may have been a tack strip.

Q Okay.

A And I went down Division. 10:50:22

Now, anybody involved in crime that's a meth addict that's involved in stolen goods and stolen cars and stuff like that knows that, if you just pull into a neighborhood, you get out and you run.

And that's -- so a couple blocks down Division 10:50:43 I made a left, and I tried to run. And I just couldn't do that. It was -- you didn't ask any of these questions, so I'll let you ask the next question. Sorry.

Q No, no. Don't apologize. I basically was going to ask you to just continue, because I just want to know 10:51:08

to assault somebody, to put somebody in a wheelchair, it was a conscious decision under the influence of drugs that I made that day to run from the police.

Q Thank you for sharing all that. I appreciate it. I want to go back and just ask a few questions about what you shared, just to make sure I understand. Is that all right? 10:58:25

A Okay.

Q So if I understand you correctly, you became aware of the police when your passenger came back to the truck and told you they were there? 10:58:35

A No. I was gone from the truck. The minute the truck stopped ----

Q I'm talking about Tom's Bar.

A Oh. Tom's Bar. Yeah. Yeah. 10:58:49

Q You didn't see the police yourself; you just were told by your passenger?

A Yes. Yeah, I did not see the police up until that point. We were parked on the side. I was, again, trying to connect WiFi, and I would spend an hour trying to connect it, and never get my phone calls made, you know. 10:59:05

Q Gotcha. And when you -- okay. So he comes and he tells you the police are there, you drive out Division, you turn back and head the other way. And that's when you 10:59:26

to assault somebody, to put somebody in a wheelchair, it was a conscious decision under the influence of drugs that I made that day to run from the police.

Q Thank you for sharing all that. I appreciate it. I want to go back and just ask a few questions about what you shared, just to make sure I understand. Is that all right? 10:58:25

A Okay.

Q So if I understand you correctly, you became aware of the police when your passenger came back to the truck and told you they were there? 10:58:35

A No. I was gone from the truck. The minute the truck stopped ----

Q I'm talking about Tom's Bar.

A Oh. Tom's Bar. Yeah. Yeah. 10:58:49

Q You didn't see the police yourself; you just were told by your passenger?

A Yes. Yeah, I did not see the police up until that point. We were parked on the side. I was, again, trying to connect WiFi, and I would spend an hour trying to connect it, and never get my phone calls made, you know. 10:59:05

Q Gotcha. And when you -- okay. So he comes and he tells you the police are there, you drive out Division, you turn back and head the other way. And that's when you 10:59:26

A That's where I saw -- the first time that I seen the police for myself; yeah.
Q So you went the other direction --
A Yeah.
Q -- and headed out towards? 11:00:48
A Yeah. So, you know, the back of Tom's Bar leads out onto Division. And it was really busy. It was, like, morning time commute. And so there was a guy, you know. There was an officer. He was walking up and down the side of the building. 11:01:08
Q Okay.
A And so when I seen him, I backed up and then went back around the other side of the bar, to the front of the bar, and made a left and went, I guess that would be, either west -- that would be west on 39th. Correct? 11:01:22
Q Sounds right to me.
A Or north? That would be west. Okay.
Q Down 39th is good enough, I think.
A Down 39th. Yeah. Towards Hawthorne.
Q Yeah. And was there an officer on that side of the building, too? 11:01:37
A Not on the side of the building. He was more off to the other side of the parking lot, coming towards the driver's side.
Q And you said it looked like he threw tack 11:01:51

strips? I think we call them spike strips. Is that what you're referring to?

A Yeah.

Q Did you notice whether they got underneath the truck as you drove by. Did you see if they impacted the truck at all? 11:02:03

A I wasn't sure.

Q Okay.

A I wasn't sure. I assumed I ran them over, and that maybe the tire didn't pop maybe. 11:02:16

Q So between the time that you left Tom's Bar and the time you abandoned the truck, did the vehicle drive as if it had a flat?

A Did what?

Q Did the vehicle feel like it had a flat? 11:02:32

A No.

Q Did you feel like it was harder to slow down or turn at all than it had been?

A No, I really didn't.

Q All right. So you also said that you saw SUV's that were police cars. Is that because -- were they marked police cars? 11:02:47

A Yes.

Q Okay. So you could see that the police were in the area. 11:03:00

A Yeah. I seen that they -- and I knew that, like, they were looking for me.
Q Did they have their lights on, their overhead lights?
A No. The one was like -- there was one, he was parked, and he was, like, standing in front of his -- standing in front of his SUV. I mean, if my memory serves right, I'm pretty sure that's what. And that was where I decided to turn right and go towards Hawthorne. The whole time I was just trying to find any spot to park and just jump out of the truck and get out and run on foot, you know. 11:03:13 11:03:33
Q And you don't need to talk about the specifics, but it sounds like you'd done this a few times before.
A I had been in a situation, in a few situations, yeah. And, like, when I was on meth my instant reaction was always just to run. And whenever they catch me I'm always very -- I would always be very cooperative with them. I would say, hey, you know, hey, I'm not trying to -- you know. 11:03:49 11:04:07
Q It sounded like you had a plan. So head to the neighborhood. That was part of the plan?
A And just get out and run. My only plan really, you know, I really couldn't really plan it out. It's, like I said, when neurotransmitters react, it's like there 11:04:20

A I did. I seen a few, I want to say two -- at least two times I recognized police vehicles. One time he was just parked, and he was, like, I want to say, just in front, standing in front of his vehicle. And that was just in the residential area between, you know, I would 11:11:44 say probably about around 30th and somewhere halfway between Division and Hawthorne. You know, somewhere in that area, in those few streets, I noticed one. And then I noticed another one when I was at, not Hawthorne, the next one down, the next main road. I noticed that there 11:12:10 was an officer. And he had his lights on. And that's when I went up the hill.

I was a little reckless at that point with driving through that intersection, which was at that point I was just like, look, I was just trying to get out. And 11:12:26 my passenger was like, look, man, we need to stop, just please, you know. I was like, don't worry, we're going to make it, you know; we'll get out of this somehow, you know.

Q So there was one officer that had his lights on. 11:12:40 And you saw a couple other patrol cars during this time. Is that correct?

A Well, the officer that I seen between Division and Hawthorne, I don't believe his lights were on. I don't believe it, though. I could be wrong. I could be 11:12:59

Is ten minutes enough?

THE REPORTER: I only need about two minutes, and I need to talk to you gentlemen off the record.

MR. PORTER: Let's go off the record.

Mr. Sumner, let's plan on a five-minute break, unless Mr. Wallace needs longer. And then we'll be back. Okay. 11:20:23

THE VIDEOGRAPHER: We're going off the record at 11:20 a.m.

(Discussion off the record.) 11:20:28

(Brief recess was taken.)

THE VIDEOGRAPHER: We're back on the record at 11:30 a.m.

BY MR. PORTER:

Q All right, Mr. Sumner. Before the break I'd asked you about video that you watched, and you said it got cut off before you got to see it. I have the video, and it doesn't cut off. So I think we should just play it. 11:30:55

But before we get there I had a couple of questions. Okay? 11:31:10

A Okay.

Q First of all, when were you aware that an airplane was overhead and filming you? When did you become aware? 11:31:20



www.LNScourtreporting.com

A I had no idea that Air 1 was above me.
Q Okay.
A I had no idea ever, until I was informed, you know, by my attorney while I was in the county jail there.
Q Thank you. So I have the video. It sounds like you've seen part of it. I would like to share my screen. And what I want to do is -- I'll explain a few things. The infrared is called FLIR. It's a business name. So it will switch between, like, what we'd expect to see from a camera, and then it will go to FLIR, where it picks up heat. 11:31:36 11:31:54
A Yeah.
Q And sometimes (inaudible). So that makes it a little bit difficult. But we'll just watch it through. And there's things I'd like to have you just call out when you see them. And the main thing I'd like you to do is call out when you believe you saw police cars. Okay? 11:32:06
A Okay.
Q So just feel free to just say there, that corner, or this place, or that car. And I can stop it if we need to. But that's what I'd like you to do. 11:32:20
And I think this probably -- well, I'll just ask it.
Would you agree that the air video, if it contradicts with your memory, is the better evidence of 11:32:36



www.LNScourtreporting.com

get out of there and just go in any direction. And Burnside was the nearest place that I knew that I would be able to mix in or get onto a bus.

Now, I still, you know, don't see Mr. Pastrana. I never seen them at all ever. I never -- but one of the passengers, like I said, a few days later, when I ran into one of the passengers that were in the truck also, said that they did see. Because they got out the passenger side. I got out the driver's side and went north. 12:05:30

Q We'll play that and we'll talk about that part. I'm going to back it up one more time and just let it go from there. 12:05:55

A All right.

Q And we'll see how you leave the vehicle.

(Video from Air 1 played.) 12:06:05

Do you see that? Is that you?

A You mean running?

Q I'll back it up just a second, and watch for someone leaving the vehicle.

A Okay. Okay. 12:06:40

(Video from Air 1 played.)

Yeah.

Q So at about 12 ----

A I believe I had a jacket on at that point. And when I turned the corner, I took my jacket off, and I knew 12:06:53

at that point that I needed to disguise myself.
Q That's about ----
A Okay.
Q That's about 12:16 on the video, is where you leave the truck, and you're just about to round the corner 12:07:11 at 12:21.
(Video from Air 1 played.)
Let's pause there for a second.
Were you arrested that night?
A No. 12:08:11
Q I know you said it wasn't really much of a plan, but the idea to get into the blocks and disappear worked.
A I got out of that vehicle, and there were police within a matter of seconds. They were going up and down the -- is it Ankeny maybe? 12:08:31
Q Okay.
A Is that Ankeny?
And so I was trying to get to Burnside, and I was only a block away. And there was some cars -- there were some cars parked next to a building. So I ducked out 12:08:45 about where that airplane is on the video.
Q Okay.
A And I was hiding behind a vehicle while there were patrol cars going up and down Ankeny. And then somehow I made it over onto Burnside and went inside of 12:09:02

a restaurant and recomposed myself and threw my hat away or something and pulled my hair back, and tried to just, like, you know, to look different, so that I could get away on foot. And I did. I did.

Q So at that point where you were hiding behind the car, that's about 13 minutes and 11 seconds on the video. 12:09:24

Let's play the rest of it. I'll ask you that question I asked you earlier before. As you watched the video, would you agree the video shows what actually happened that day? 12:09:40

A Do I what?

Q Do you agree the video shows what actually happened that day?

A It's pretty accurate, yeah. I mean, the camera doesn't lie, that's for sure. And I'm doing my best not to give you any misinformation about what happened, you know. These are just my thoughts. 12:09:51

All I can do is -- you know, the whole point for me that day was drugs, and then get away, you know. Run away. I spent half of my life, the first half of it, just running away from my problems, as you can see. 12:10:05

Q Well, I appreciate that, Mr. Sumner. I appreciate you taking the time to talk to us today, even though it's been difficult. 12:10:23

I'm going to just play out the last few minutes of the video. I think most of it is just looking for you, but let's finish it out because you've never seen it. Okay?

A All right. 12:10:35

(Video from Air 1 played.)

Q What you described, Mr. Sumner, that sounds like you that they just described, that you made it to Burnside and went west on Burnside. Does that sound like the route you took? 12:14:57

A Yeah. I went inside of a restaurant, and then I went from that restaurant to -- across the street there was, like, a school, like a block, you know, the second block. And I walked through that schoolyard, and then I made it all the way to Sandy Boulevard, I believe it was, 12:15:16 and got on a bus. And then that was -- yeah. So it's pretty accurate.

And I know that, you know, one of the major questions here would be, you know, did I know that I was being chased. The fact is that, you know, they weren't 12:15:34 behind me with their lights on and sirens at any given point. There was no point that the police were barbarically chasing me.

But I know that with technology, myths and legends, that you only have a few seconds in a situation 12:15:56

like that if you're the criminal, if you're the perpetrator. You only have a few seconds to get away. And you have to act quick in those situations.

So it was a complete recklessness. It was a complete, you know, disregard for, you know -- while I was trying my best not to hit anything or anyone, you know, unfortunately, somebody got hit. And it's not okay. And that's why I hope more than anything, I hope that I'm doing the right thing. Because the only thing I seek from this, by being honest, is forgiveness from the city that I love. 12:16:12 12:16:36

I came from Detroit, Michigan. It's been bombarded with violence since I was a kid. Since before I was born, in the fifties, they had riots. It's just a very racist, violent city. And the whole reason that I left that city was to find a place like Portland, Oregon. And I just never did the right things when I got there. I fell into the wrong crowd. And I hope that some day that the city will forgive me and that I can give back to that community and to the city and just be a part of helping prevent crimes like this from happening in the future. 12:16:55 12:17:14

Like I said, my main studies here, I've studied psychology, sociology, western philosophy, western civilization, and just -- the list goes on. And the whole 12:17:29

Wallace [sic].
So when were you arrested?
A I was arrested on October 13th, 2022, which was, you know, seven months later, approximately.
Q Okay. 12:18:53
A Six and a half months.
Q Were you arrested for this incident, or something else and then they tied them all together?
A I was arrested from the -- I passed out at the wheel. Not driving, but I was in another stolen vehicle. 12:19:04
Q Okay.
A That I knew was stolen. I knew it was stolen.
Q Okay. I appreciate your sharing that. And I think that's probably part of your plea agreement, so I'm not worried about it. 12:19:18
A Yeah. Thank you. Thank you.
Q No problem. One question, and I've waited to ask you this. But do you know the names of the two other people that were in the car with you?
A I do. I do. I know their -- oh. But I don't know them that well. I know that the girl, I was dating her for a while, and I can't even think of her name right now. And I do. But the guy, I didn't really know him well. I'd only met him a few times. 12:19:31
Q Okay. 12:19:58

to schedule with the administration there at the prison. So I want to make sure you understood that, because sometimes we talk in shorthand because we know this process a little better than most.

Does that make sense? 12:40:28

THE WITNESS: Yes.

MR. PORTER: Okay. It's a little bit of work to get that done. It takes a couple of weeks. So we'll get it done as quickly as possible.

THE WITNESS: Okay. 12:40:38

MR. PORTER: And before we let you go, real quick, Mr. Sumner, is there anything specifically you'd like to see from us in discovery? We want to get you the most important stuff first.

THE WITNESS: Don't worry about the discovery. 12:40:53
I just want to give to my community and give to the people that were hurt in this. And I don't want to incriminate anybody else. I'm responsible for what happened. Nobody else.

MR. PORTER: Okay. Thanks. 12:41:05

THE WITNESS: If I can just somehow find my way to give back, to just give back somehow. I don't know how I'm going to do that. And hopefully some day I'll be able to.

MR. PORTER: I appreciate that. 12:41:16

CERTIFICATE OF REPORTER

I, SUSAN G. WALKER, an Oregon Certified Shorthand Reporter, Registered Professional Reporter, and Federal Certified Realtime Reporter, hereby certify that JOSEPH GARY SUMNER appeared via videoconference before me at the time and place set forth in the caption hereof; that at said time I reported by means of machine shorthand all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were transcribed by me personally, and that the foregoing pages constitute a full, true and accurate record of all such testimony adduced and oral proceedings had, and of the whole thereof.

I further certify that review of the transcript was waived.

WITNESS my hand at Portland, Oregon, this 3rd day of March, 2025.

SUSAN G. WALKER, FCRR, RPR
Oregon CSR No. 90-0195
Expires 9/30/2026

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| JESUS VELEZ PASTRANA and JOHN G. IRWIN, JR., Plaintiffs, vs. CITY OF PORTLAND, a municipal corporation; JOSEPH GARY SUMNER, an individual; SHAUN LEE PALMER, an individual; and JOHN or JANE DOE, an individual, Defendants. | 3:24-cv-00587-AB |

VIDEO-RECORDED DEPOSITION OF JOSEPH GARY SUMNER

Taken on Behalf of Defendant City of Portland

March 21, 2025
VOLUME II

BE IT REMEMBERED that, pursuant to notice and the Federal Rules of Civil Procedure, the deposition of JOSEPH GARY SUMNER was continued before Susan G. Walker, an Oregon Certified Shorthand Reporter, on Friday, the 21st day of March, 2025, commencing at the hour of 9:50 a.m.; the witness responding to questions via videoconference from Ontario, Oregon; the questions propounded and proceedings reported remotely via videoconference.

I'm going to just play out the last few minutes of the video. I think most of it is just looking for you, but let's finish it out because you've never seen it. Okay?

A All right. 12:10:35

(Video from Air 1 played.)

Q What you described, Mr. Sumner, that sounds like you that they just described, that you made it to Burnside and went west on Burnside. Does that sound like the route you took? 12:14:57

A Yeah. I went inside of a restaurant, and then I went from that restaurant to -- across the street there was, like, a school, like a block, you know, the second block. And I walked through that schoolyard, and then I made it all the way to Sandy Boulevard, I believe it was, 12:15:16 and got on a bus. And then that was -- yeah. So it's pretty accurate.

And I know that, you know, one of the major questions here would be, you know, did I know that I was being chased. The fact is that, you know, they weren't 12:15:34 behind me with their lights on and sirens at any given point. There was no point that the police were barbaric-ally chasing me.

But I know that with technology, myths and legends, that you only have a few seconds in a situation 12:15:56



EXHIBIT 3
Declaration of Michael K. Porter
Page 2 of 18

Wallace [sic].
So when were you arrested?
A I was arrested on October 13th, 2022, which was, you know, seven months later, approximately.
Q Okay. 12:18:53
A Six and a half months.
Q Were you arrested for this incident, or something else and then they tied them all together?
A I was arrested from the -- I passed out at the wheel. Not driving, but I was in another stolen vehicle. 12:19:04
Q Okay.
A That I knew was stolen. I knew it was stolen.
Q Okay. I appreciate your sharing that. And I think that's probably part of your plea agreement, so I'm not worried about it. 12:19:18
A Yeah. Thank you. Thank you.
Q No problem. One question, and I've waited to ask you this. But do you know the names of the two other people that were in the car with you?
A I do. I do. I know their -- oh. But I don't know them that well. I know that the girl, I was dating her for a while, and I can't even think of her name right now. And I do. But the guy, I didn't really know him well. I'd only met him a few times. 12:19:31
Q Okay. 12:19:58

got arrested October 13, 2022, I felt the greatest relief. I felt like there was just this world that was, like, lifted off of my back; this world of just this negative stuff that I really didn't want to be involved in. I couldn't trust any of the people that I knew. I didn't 10:21:14 want to know them. I didn't want any of what I had, anything I was doing.

What I really want is what everybody wants; their family, their people. And I've struggled very hard, you know. 10:21:33

But that minute, you know, the officers, when they caught me, I was passed out in another stolen vehicle that morning. And I was just like this, passed out in the driver's seat. And they arrested me, you know. They were very nice to me. They let me have the last cigarette that 10:21:47 I'll ever smoke again. They talked to me. And I said, this is the best thing. I said, this is it. I said, I know this. And I just remember crying.

That was the last minute that I was in society, and I knew that I no longer needed to be a part of it 10:22:06 for a while; that if I wasn't -- that the degradation ceremony, hopefully this is a part of the end of the degradation, and that I can be properly resocialized. That's what I hope.

And I know that that's irrelevant to what you're 10:22:22

release me, and then I would just go back to Portland, and I never took care of it. I never seen a judge, and I was OR'ed every time.

So that, I was extradited to Salem, like, 29 times or something like that. And eventually, finally, there was a public defender I had in 2018 who helped me take care of that warrant. 10:24:26

So the thing is, when I got out of prison, you know, I could have made better choices. I should have made better choices. And I would have made better choices if I hadn't started using again. 10:24:45

Q So let's talk about the people in the car. Okay? In the box truck on that day. Does Michaela --
A Yeah.
Q -- sound like one of the people that was in there? 10:25:09
A Yeah.
Q What was your relationship with Michaela? I think you talked about it briefly, but refresh my recollection. 10:25:20
A Could I please not answer that, David?
Q Why not?
A I mean, I told you before basically, like, we got high and we had sex. And I've never paid for sex in my life, but, in retrospect, I believe that what she 10:25:36

sought was drugs, I believe. But I do want to be honest with you. And, yeah, person mentioned number 1 on this page. Yeah.

Q What are you looking at?

A I'd prefer not to say any more. I don't want to incriminate anybody. I can respect where you're at. And as far as passenger number 2 goes, I really don't know that person nearly as well as I knew Michaela. And I really don't know much about Michaela. I couldn't tell you anything about her background. Well, maybe a little bit. But, I mean, she's just a girl, man. 10:26:00 10:26:22

Q Yeah.

A She had nothing to do with it. She was not a part of the purchase, or she wasn't driving, or anything like that. 10:26:41

Q I don't know if this will ease your mind at all, but she was arrested, you know.

A Is she alive?

Q She is.

A Yeah. 10:27:01

Q Okay. So you knew Michaela. Who was the other individual?

A I really don't know the guy. It was like a Taylor or a Tyler or something. I seen -- there was a page in here where it had a guy's name listed named 10:27:15

of unclear also. I don't have the exact details because there was something that was -- it was just like it was spur of moment. And when I was in the middle of the transaction there was, like, an incident. And so I know that I had given it back to him, but then he gave it back to me. 10:29:07

Q And before the video even starts, you indicated that you had gone to a Plaid Pantry. Is that right?

A Yeah. I was trying to use the WiFi there.

Q And where was Michaela sitting? Was she in the middle or was she on the far side of the window? 10:29:29

A I believe in the middle. Yeah. I believe. I believe in the middle.

Q And walk me through what happened at Plaid.

A A kid came out, you know. I'm trying to log on to the WiFi. And a kid came out, and he was like, come on, let's go. He had stole some cigarettes or something. Some cigarettes. I remember -- I know he stole a pack of cigarettes. I think what happened was he said, hey, can I get a pack of cigarettes? And they don't just hand them to you; they set them on the counter. I believe he snatched them and took off running. 10:29:49 10:30:07

Anyways, we had to leave that parking lot. And I was pretty pissed off about it. Excuse my language. I was pretty upset about having to leave, because I was 10:30:21

trying to get drugs, and I knew that my connect was in that neighborhood, somewhere right there by that New Seasons, by that Plaid. And so I wanted to stay there. My drugs were there. And having to go distance and then trying to find WiFi was really just a pain. 10:30:41

And then so we made it to Tom's probably ten minutes later.

Q Why did you call him a kid? How old is he?

A Well, I mean, probably 25, 30, I'm guessing. Well, I mean, he was kind of bald. So I really don't 10:30:58 know. But I know if I had to guess, he was younger than me -- I know that -- by at least ten, fifteen years. So, I mean, it's hard to tell because I really don't know the guy that well. As far as I knew, his name was Taylor or Tyler, and that's all I really knew about the guy. 10:31:18 I didn't know -- I didn't hang out with him.

I really didn't hang out with guys that much on the street. I didn't trust them. I knew if they were anything like me, drug addicts, that they couldn't be trusted. 10:31:35

Q How far away or how much time do you think elapsed from Plaid to Tom's Diner?

A Probably ten minutes. It was lunch time or just before. Right around there. Maybe just after.

Q And you went to Tom's Diner to try to get WiFi 10:31:55

there?

A Yeah. And because of the fact that I was parked over on the side, I couldn't pick up the signal. So I pulled around the back of it. And the part that's unclear to me, David, that's very unclear, is exactly what triggered me to knowing that I was being tailed, that I was about to get caught, that I was about to get, you know, ambushed, whatever the word is you want to use. 10:32:16

Q Who went inside Tom's?

A The guy. He went inside. So that would make Michaela in the middle. 10:32:37

Q When the guy came back from going into Tom's Diner, did he say anything to you that you recall?

A I really can't. I really can't. Like I said, my mind was fixated on scoring. And I was kind of annoyed with the guy at that moment because of what he had done, you know, by stealing from the Plaid, you know. And so when I pulled in the back, it seems to me like he had gotten out. But I could be wrong. Because after watching the video with you guys last time, it might have been -- there might have been an officer that peeked around the corner. It's something like that that made me back up and say, okay, there's a cop over on the side of the building; I'm going to go out onto Division, or onto Cesar Chavez, onto 39th. 10:33:01 10:33:27 10:33:49

So I was no different or no better than any of them that were just walking around pecking like a chicken with no eyes.

Q So is it likely that when you were smoking cigarettes you would have the windows down? 10:43:49

A Possibly. Possibly. But I really -- I can't answer that honestly, David. I really, really can't.

Q I understand.

So after you were alerted in some way to the cop in the south or the bottom portion of this video and you 10:44:07 started taking off in the opposite direction, what was going on in the car? Who was talking? What were they saying?

A Well, whatever somebody else might have been saying, I remember once or twice, a couple times the 10:44:29 passenger guy just -- I remember both passengers saying, hey, they were scared. They didn't want to be in there. They didn't want to be in that situation. I tried to -- I said, hey -- I remember saying, like -- well, maybe not saying, but I remember pretty much my stance was like, 10:44:53 stop this, I got this, we're going to get to the next main road, we're going to get out, we're going to scatter, good luck, and it will be okay. Don't worry about it. Because they're not allowed to chase us. They're not allowed to chase us. And so we're going to get away. We just have 10:45:09

to get to the next main road. And when we do, everybody just scatter, and you'll be fine.

And so I remember both of them just being like, no, come on, please, just let me out. And I was like, I can't stop right now. We're going to stop in a minute. 10:45:25 And I remember both of them at one point -- I remember especially the guy just being like, please, let's stop this car, man, you know. Let me out of here. Let me out. He was freaking out. Obviously, you know, by that point in my life obviously, as you know by my record, I had 10:45:42 tried to elude the police a few times in vehicles. It had become almost, I don't want to say a sport, but it was just a common knowledge that the police won't chase you if you go into a residential neighborhood. If you just pull in somewhere, and that if you can make it 30 blocks, they 10:46:01 don't tail you.

Now, how much of that is myth in reality, I really don't know. It's just what we would call practical knowledge; practical street knowledge, so to speak.

That looks pretty good, whatever that was. 10:46:25

Q Cantaloupe.

Did Michaela and -- let's just call him Tyler. Did Michaela and Tyler know the police were following you?

A Well, I don't know exactly what knowledge they had other than they knew that I was trying to get to a 10:46:46

Now, at no time -- I mean, I just remember just, you know, I can barely remember, but it's a one-train thought. I'm not sure what you call that. It's not a peripheral, but a tunnel vision. All senses are just focused on one, you know. 11:01:29

Q And I know I asked this previously, but, once the spike strips were thrown, that's when the panic set in?

A Oh, yeah. Yeah. Once I seen the -- when I seen that officer, my heart rate rose just as much as if you 11:01:51 were to light up a meth pipe or if you were to whip out a bag of drugs or show me a meth rig right now. My heart rate would go up. And there are just neural impulses that just block any rational thinking.

And so my reaction and -- now, another thing 11:02:16 about the strips was I don't remember the car wobbling. However, if it were, it wouldn't have mattered to me. I would have kept going anyways. So I really don't know, you know.

I know now, after seeing the video and after 11:02:38 reading the discovery, that there was a tack strip that I ran over, and after seeing the video, especially where the tire was pretty much like sparking. It looked like it was on fire. I didn't even -- I wasn't able to focus on that. I was only able to focus on getting out of the vehicle and 11:03:02

the noise in the vehicle. Like, the guy especially, man, he was almost to the point where -- I think that was part of the reason that I might have sped up, was just to avoid him, like, jumping on me or something, because he wanted out so bad. 11:03:21

Q And you don't remember the vehicle operating any differently?

A I really don't. I really don't. The only time I know that it was messed up is when I went through that, you know, that intersection, and then -- and it started 11:03:40 wobbling. And it sounds like -- it seems like I might have at some point, I might have heard something scraping. I might have -- yeah. I heard something scraping. And I know that we wobbled into a few cars on the side. And I know you've shown me the video a few times, and I still 11:04:01 don't recall ever seeing either one of the victims before or after, how they were hit. I still -- maybe my brain is blocking it from you showing it to me. I'm not sure. And I hope it's not. But I still don't understand how they got hit. Because if I had seen them, I'd have just tipped 11:04:21 the vehicle over. I'd have crashed into a car. I'd have never ever aimed a vehicle at another human being and ran them over. It just never would have happened, no matter what drugs I'm on.

Remember, I got here from the Grateful Dead. 11:04:41

You're giving him information and asking him questions. His knowledge is what he remembers.

MR. WALLACE: Okay.

BY MR. WALLACE: (continuing)

Q So John Irwin was found here (indicating), and Jesus was found here (indicating). 11:08:48

What do you recall after the collision?

A I remember wobbling, and I remember I had been asking the passengers to help me gather up any drugs that may have been on the dashboard so that we didn't leave any drugs behind. And obviously we left our weed. And I just -- at that point nobody else matters. Nobody else matters that's in the vehicle, I should say. 11:09:11

And so, yeah, I remember -- I don't even remember it sliding as much to the left. I just remember it going wobbling, and I remember hearing some dragging. And I knew that I was only a block or two from Burnside and that, if I could make it to Burnside, there was a bus, or there was a restaurant, or there was some way that I could dodge this bullet; dodge this being arrested. 11:09:32 11:09:55

And -- I'll be honest with you -- later on that night, I can't remember what it was that compelled me to see the news. Maybe somebody told me or something. But for some reason I really didn't believe the news story. I didn't believe that two people had been injured. 11:10:18



www.LNScourtreporting.com

I didn't believe it. Because I was like, how could they -- how? It's impossible.

So, until now, I really didn't believe that I had hit those people. I really believed that that car right there, or possibly one of the cars on the side, like, you know, like when there's an accident a lot of times a car will hit, and then it will roll back and then it will roll forward? I believed until now that that's what happened, or that they were standing on the other side of the car, the cars that are parked on the side. There was no point that I seen them.

Now, a couple days later I ran into the middle passenger. We all know her name. And she said, no, there were some people hurt. And she informed me that there was -- that either her father maybe was, like -- knew some people in the department, is what she said, I believe was her exact quote. My dad knows some people in the department, and they've got all of it on video, on an air thing. And she told me at that point that there were two people hurt. And I was like, well, they weren't hurt bad, right? Maybe, you know, like, were they -- you know, and she said one of them was bleeding from his head really bad. And that's when I knew that I -- you know, and that was just a couple days, like, after, after the accident.

I'll never forget that day, April 29th. That

11:10:38 11:10:58 11:11:23 11:11:49 11:12:06



www.LNScourtreporting.com

know, he was just freaking out, man. He was like, whaaaaaa, you know, by this point. And I was just like, man, oh, dude, stop, it's going to be okay. And, like, with Michaela it was a little bit easier. It was like, hey, trust me, okay. It's going to be okay. Stop. We're going to get out of this. We're going to get away, you know. 11:42:17

And at that point, once they started panicking, yeah, I should have stopped. I mean, I could have stopped. But I couldn't even focus on the road ahead of me, really. 11:42:31

And so finally, I remember that -- I believe that if you were to watch the speed of the vehicle you could pretty much guess the tone of the voices and, you know, the amplification of their voices at the same time. It was just like -- it was like, oh, my God, I can't -- you know, I got a professional amateur here, you know. A professional amateur. What a junkie, you know. We were all junkies. 11:42:49

Q Thanks for that. 11:43:10

A Yeah.

Q You mentioned being chased by the police several times prior to this incident. When you say chased, what do you mean by that?

A Well, it's like this. There are no high speed 11:43:18



www.LNScourtreporting.com

chases in the city of Portland. And so to get these, you know -- it's more like the initial confrontation, you'll see the police, you'll see the cops, and once they know, they'll follow you. They'll do the speed limit for a minute, but then they just -- the minute you pull into a neighborhood, they're gone. And so that was pretty much what happened. 11:43:46

The only problem was that I didn't really pull into a neighborhood. If you remember what I said, between Division and Hawthorne there's a red light. And that street is kind of like a main road, because it's pretty much the same distance from Hawthorne to that street. It might be Lincoln. It could be -- I'm not sure what the name of that road is where I turned left. Okay? But I know that it's the same distance. So it makes the distance from Division to Hawthorne further than the distance from, say, Hawthorne to Stark or Hawthorne to Belmont. 11:44:03 11:44:20

So when you're being chased by the police, it ends the minute you turn into -- either you go over the speed limit or you turn into a neighborhood. The chase is over. So it's just a matter of getting out of sight at that point and getting off of the cameras that are just everywhere. Jack Black, that movie, Enemy of the State, wasn't good for the mentality of any meth addict. 11:44:35 11:44:54



www.LNScourtreporting.com

CERTIFICATE OF REPORTER

I, SUSAN G. WALKER, an Oregon Certified Shorthand Reporter, Registered Professional Reporter, and Federal Certified Realtime Reporter, hereby certify that JOSEPH GARY SUMNER appeared via videoconference before me at the time and place set forth in the caption hereof; that at said time I reported by means of machine shorthand all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were transcribed by me personally, and that the foregoing pages constitute a full, true and accurate record of all such testimony adduced and oral proceedings had, and of the whole thereof.

I further certify that review of the transcript was waived.

WITNESS my hand at Portland, Oregon, this 30th day of March, 2025.

SUSAN G. WALKER, FCRR, RPR
Oregon CSR No. 90-0195
Expires 9/30/2026

# PLACEHOLDER

## Video Exhibit 4, AIR1 Video

### Subject to SPO

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | | |
|---|---|---|
| Jesus Velez Pastrana, and John G. Irwin Jr., Plaintiffs, | ) | |
| vs. | ) | Case No. 3:24-cv-00587-AB |
| City of Portland, a municipal corporation, Joseph Gary Sumner, an individual, Shawn Lee Palmer, and John or Jane Doe, an individual, Defendants. | ) | |

ZOOM DEPOSITION

of

QUINCY HO

January 28, 2025

Q. Unless it's no ambient noises and they're looking for you, right?

(Simultaneously talking. Reporter asked for clarification.)

THE WITNESS: No.

Q. (By Mr. Wallace) How long did you follow this vehicle?

A. I don't recall about the video.

Q. Were there different stages of the pursuit, the circumstance?

A. Different stages of it?

Q. Right. I can clarify if you want.

A. Yeah, could you please.

Q. Sure. Yeah. So I would imagine for me stage one would be locating the vehicle. That happened here, right?

A. Yes.

Q. And for me stage two would be using some intervention action. That happened here, right?

A. I think spikes were attempted, I'm not sure if they were successful or not.

Q. Right. Then after spikes were attempted, whether they were successful or not, there would be following of the vehicle to monitor it, correct?

A. By air support, yes.

STATE OF OREGON )
) ss.
County of Yamhill )

I, Karen Edwards, a certified shorthand reporter for Oregon, hereby certify that, pursuant to the stipulation of counsel for the respective parties hereinbefore set forth, QUINCY HO appeared via Zoom before me at the time and place set forth in the caption hereof; that at said time and place I reported in Stenotype all testimony adduced and other oral proceedings had in the foregoing manner; that thereafter my notes were reduced to typewriting under my direction, and that the foregoing transcript constitutes a full, true and accurate record of all such testimony adduced and oral proceedings had, and of the whole thereof.

WITNESS my hand at McMinnville, Oregon, this 8th day of February, 2025.

CERTIFIED SHORTHAND REPORTER
Oregon
CSR
90-0145
Karen Edwards

Karen Edwards
Certified Shorthand Reporter
Certificate No. 90-0145

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | | |
|---|---|---|
| JESUS VELEZ PASTRANA and JOHN G. IRWIN JR., Plaintiffs, | ) | |
| v. | ) | No. 3:24-cv-00587-AB |
| CITY OF PORTLAND, a municipal corporation, JOSEPH GARY SUMNER, an individual, SHAUN LEE PALMER, an individual, and JOHN or JANE DOE, an individual, Defendants. | ) | |

VIDEO DEPOSITION OF SUSANNAH HOPE BADGER

Taken on behalf of Defendants

* * *

BE IT REMEMBERED THAT, pursuant to the Oregon Rules of Civil Procedure, the video deposition of SUSANNAH HOPE ANNIE BADGER was taken before James D. Gardner, an Oregon Certified Shorthand Reporter and a Registered Professional Reporter, on Tuesday, February 25, 2025, commencing at the hour of 10:35 a.m., in the offices of City Attorney's Office - Portland, 1221 S.W. 4th Avenue, Suite 430, Portland, Oregon 97204.

will start talking about what happened that day. Have you discussed this case with anyone else?
A Of course. My partner, other people on the block, just because there was a lot of people there, you know, standing around at the same time, "Do you know those guys," different things of that nature. I haven't been able to hear anything substantial from anybody about this case at all, so I don't know anything about it except for that day. 10:45:03
Q Well, while it is my job to ask you some questions, I think the way I ask questions might give you an idea of some of the things that are going on. So we will just explore together. 10:45:31
A All right.
Q So you talked to a bunch of people that day. How about after the incident? 10:45:42
A Just my partner.
Q Okay. Do you remember if anybody that day told you they saw the crash?
A My partner saw the crash. She was sitting on the corner. 10:45:54
Q On the corner of 26th and Pine?
A Correct. They had walked past her right before they were struck.
Q Okay. All right. So she was right there when it 10:46:11

MR. PORTER: Can you see it now?

MR. WALLACE: Yeah. Hold it up a little bit more so I can see the -- yeah. That's perfect. All right. Where is the -- can she describe some of the symbols? 11:02:31

MR. PORTER: Yeah.

Q BY MR. PORTER: Walk us through your diagram here.

THE WITNESS: Okay. So this is me. This is where I was parked. I came out here. The 11:02:37 truck came this way. They have a stop sign. They hit me. These are the two pedestrians.

MR. WALLACE: Right.

THE WITNESS: These are the two pedestrians, where they ended up, and then the truck's 11:02:47 pathway. These are the cars that were hit, and this is the other truck that was hit. So they hit me, them, this, there, and ended up here. And I went running around the corner and lost them here. So this is how many houses are here, and I come running back. And 11:03:07 then the lawn mower was here. I'm sorry. Here.

MR. WALLACE: The lawn mower was parked on the street?

THE WITNESS: Yeah, in the street.

MR. WALLACE: Okay. 11:03:21

A When I ran back to the car, she didn't know that that was my car, and she didn't know that that was me. So when I came up to her, she was surprised that I was standing there next to her. I think it came to realization when we were -- when the guy told me or asked, "Whose car is this," and I said, "That was mine." She realized that that was my car. So it was a while afterwards that she -- she's not much of a person who, you know, just talks and talks and talks. I'm that person. But she didn't really talk to me. She was just focused on those two people on the ground. 12:16:43 12:17:07

Q And so I think that you said in your testimony that you had ran after this skinny woman and by the time that you came back, immediately there was officers with -- at least one officer with his gun drawn? 12:17:27

A Uh-huh, his rifle. He had a long rifle.

Q If you had to estimate -- I think that you did before, but I just wanted to see if you recall anything after watching the video. How far did you run, and when were you back there? I'm really trying to gauge how fast the police officers were at the scene. 12:17:49

A Between one and two minutes. It wasn't very long at all that I had run down the street, turned around, and ran back. One to two minutes. It takes me probably a while for me to run anywhere, but the blocks 12:18:23

CERTIFICATE

I, James D. Gardner, a Registered Professional Reporter, Washington Certified Court Reporter, and Oregon Certified Shorthand Reporter, hereby certify that said witness personally appeared before me at the time and place set forth in the caption hereof; that at said time and place I reported in stenotype all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were transcribed through computer-aided transcription, under my direction; and that the foregoing pages constitute a full, true and accurate record of all such testimony adduced and oral proceedings had, and of the whole thereof.

I further certify review of the transcript was not requested.

Witness my hand at Vancouver, Washington, this 4th day of March, 2025.

____________________

James D. Gardner

Oregon CSR No. 23-0103

Expires 3/31/2026

Washington CCR No. 23007586

Expires 3/13/2025

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

JESUS VELEZ PASTRANA and JOHN G.)
IRWIN, JR., )
Plaintiffs, )
)
VS. )NO. 3:24-cv-00587-AB
)
CITY OF PORTLAND, a municipal )
corporation, JOSEPH GARY SUMNER,)
an individual, SHAUN LEE PALMER,)
an individual, and JOHN or JANE )
DOE, an individual, )
Defendants. )

VIDEO DEPOSITION OF CAROLE BLAKE

TAKEN ON BEHALF OF DEFENDANTS

* * *

BE IT REMEMBERED THAT, pursuant to the Federal Rules of Civil Procedure, the video deposition of CAROLE BLAKE was taken before Paula D. Tieger, a Registered Professional Reporter and Oregon Certified Shorthand Reporter, on March 14, 2025, commencing at the hour of 10:07 a.m., in the City Attorney's Office - Portland, 1221 SW Fourth Avenue, 1st Floor Conference Room, Portland, Oregon.

* * *

During that time right after the first strike -- the white box truck striking your partner's car or your partner striking the box truck -- did you hear any sirens?

Or do you recall? 10:53:00

A I do not recall any sirens.

Q Okay. Was it a pretty loud noise when the ricochets started happening?

A Yes. Yes.

Q And that drew your attention immediately to there? 10:53:12

A Correct.

Q Okay. So, now let's move into what I call the second phase, you know.

After the commotion happening, tell me in detail what you saw and what you heard. 10:53:29

A So, saw the white truck ricochet, come to a stop. My head kind of swings back to the intersection where I started it.

And that's when I saw the two pedestrians laying on the ground. 10:53:46

Q Okay.

A Because they were on the far side.

So, I didn't see the impact on them.

Q So, shortly after -- a couple seconds after the ricochets and the debris, your head turns towards the 10:53:57

CERTIFICATE

I, Paula D. Tieger, a Registered Professional Reporter and Oregon Certified Shorthand Reporter, hereby certify that said witness personally appeared before me at the time and place set forth in the caption herein; that at said time and place I reported in stenotype all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were transcribed through computer-aided transcription, under my direction; and that the foregoing pages constitute a full, true and accurate record of all such testimony adduced and oral proceedings had, and of the whole thereof.

I further certify review of the transcript was not requested.

Witness my hand at Portland, Oregon, this 20th day of March 2025.

Paula D. Tieger, RPR 49268
Expires 9/30/25
Oregon CSR 20-0476

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| Jesus Velez Pastrana, and John G. Irwin Jr., Plaintiffs, vs. City of Portland, a municipal corporation, Joseph Gary Sumner, an individual, Shawn Lee Palmer, and John or Jane Doe, an individual, Defendants. | Case No. 3:24-cv-00587-AB |

ZOOM DEPOSITION

of

RYAN HERNANDEZ

January 28, 2025

well as proactive police work when applicable.
Q. Okay. What background and experience do you have with regard to police chases, intervention tactics?
A. The training that we receive at DPSST regarding the different intervention strategies, pursuit management, pursuits in general, as well as our training here with the Portland Police Bureau and advance academy.
Q. Could you elaborate on that a little bit?
A. Which part?
Q. I mean -- so, okay. Let me just start fresh.
You're aware of the circumstances of why we're here, correct?
A. Yes, sir.
Q. Okay. You've generally read the complaint? I'm not going to quiz you on it, but you know why we're here, correct?
A. Yes, I have a general understanding of why we're here.
Q. Okay. So my questions, although they may be inarticulate at times, please tell me when they are, my focus is to have an understanding about your background in leading up to the deployment of the spike strips. Does that make sense?
A. Okay. Yeah.

Q. That makes sense?

A. Yep.

Q. And obviously we're in a deposition so you're under oath. So if this goes to trial, I'll take whatever you said in court -- or you said here and bring it in court. That makes sense as well, correct?

A. Yes, that's my understanding.

Q. Have you given a deposition before?

A. This is my first one.

Q. Okay. Welcome.

You can take a break whenever you want. Chat with your representative. Answer audibly. Don't nod, so Ms. Edwards can type it out what exactly it is that you're saying. Does all that kind of make sense?

A. Makes sense.

Q. Okay. So my question related to your experience, strictly speaking, was, what experience do you have with police intervention tactics as they relate to you're in a police vehicle and you're trying to stop somebody? So give me a background on that for DPSST records, or whatever training and experience you've had for that.

A. Okay. We have pursuit management, DPSST.

Q. And what's that?

A. What's that?

Q. What is that?
A. How to manage a pursuit when you get into a pursuit of a vehicle, obviously, how that relates to state law, as well as -- but at DPPST it's statewide so there's no bureau specific policy involved, so we're just learning general skills.
Q. And generally what does that look like? I'm not -- I promise you I'm not trying to dig in the knife or anything like that. I want to know generally, what does it look like from that state level as far as abide by this, do this, do that. Does that make sense?
A. Yeah. So the skills of engaging a vehicle in pursuit, the information that you need to put out on the radio, how to drive accordingly, lights, sirens, clearing intersections, and then providing information over the radio regarding the initial stop, driving behavior of the vehicle, environmental conditions, and then traffic, pedestrians, traffic, all that stuff, everything you're seeing.
Q. Okay. So what I want to do is, I want to have a hypothetical situation, then we'll talk about this situation. So, hypothetically speaking, you get a call that says somebody is driving erratically. What happens then?
A. Driving erratically?

of the parking lot, the northeast corner of the parking lot, to get spikes strips ready in case the vehicle decided to reverse and return onto Cesar Chavez from the parking lot.

Q. Whose decision is it to throw spikes?

A. Mine.

Q. Okay. You don't have to check in with anybody?

A. Nope.

Q. You have training and experience, right?

A. Correct.

Q. Okay. And is it pretty dangerous to throw spikes for you personally?

A. Yes.

Q. Okay. And what are the factors that generally you consider before throwing spikes?

A. I'm going to be looking for cover, because that's the most dangerous thing is to put myself in front of a vehicle that's moving that's likely wanting to not be -- or evade contact with us. Oftentimes they will do whatever they can to avoid contact with us. So I'm thinking about position where I can protect myself but as well as lay out spike strips or apply the spike strips in a way that will be effective in spiking the car.

Q. And your vehicle's trunk would have been facing the box truck?

A. The trunk would have been facing Cesar Chavez.

Q. Okay. So you are parked perpendicular to Chavez?

A. Correct.

Q. Got it. Okay.

A. I pulled straight into the parking lot to the right, north side of it, so I was perpendicular to Cesar Chavez.

Q. Did you let anybody know over the radio, or whatever devices you guys have to communicate, that you were laying the spike strips?

A. Not at that time.

Q. Okay. After that, though, I'm guessing you did?

A. After I threw the spikes and there was -- the tire ran over the spikes, yes, I radioed that there was a good spike.

Q. Was it -- is there a reason why you didn't try to use your vehicle to prevent exit after it was spiked?

A. That's against our policy.

Q. Why?

A. To block an exit with my vehicle, I'd have to provide the vehicle with an opportunity to leave unless

I'm boxing in the vehicle.

Q. Oh, okay. What you're telling me is, of the two interventions that I'm talking about, boxing in and spiking, those two have entirely different protocols, correct?

A. Yes. And blocking the driveway with my vehicle is a barricade that's boxed in, that's something completely different.

Q. I guess this might be something you have to speculate to so don't answer it if you can't. Why would you not try to box in a vehicle after it's spiked?

A. No. That's one of our thought processes that we go through after a vehicle is spiked to box it in. But a vehicle -- we have to have the opportunity to do it, to box it in.

So there's two types of box ins. There's a static box in and dynamic box in. A static box in is on a vehicle not moving. In this case the vehicle was moving, so was not possible. The dynamic box in is when a vehicle is moving or we have to contact the vehicle with greater force because we're moving. But, again, that takes vehicles on both sides, police vehicles on both sides of the vehicle that we're going to box in, and in this case we did not have that.

Q. You did have that, right, there was officers

A. In terms of who organized it, I don't know.
Q. Okay. So you said that you parallel parked. Where did you parallel park approximately?
A. No. I said I paralleled the vehicle. I didn't say I paralleled park.
Q. What does parallel the vehicle mean?
A. I was driving generally parallel to it on a different street.
Q. Oh, okay. So you were engaged in a chase without them knowing?
A. No. It's not a chase or a pursuit.
Q. It's just following?
A. No. I wasn't following the vehicle either.
Q. You're following the vehicle just a couple of streets over, right?
A. No. Following the vehicle would be behind the vehicle.
Q. How many streets over were you?
(Simultaneously talking. Reporter asked for clarification.)
THE WITNESS: I think my response was I don't recall how many streets away I was. Several.
Q. (By Mr. Wallace) "Several" as in ten or less than ten?
A. I don't recall.

Q. Were your lights activated?
A. No.
Q. Siren activated?
A. No.
Q. Okay. How many other officers were involved in this pursuit, or --
MR. PORTER: Objection. Calls for speculation.
Q. (By Mr. Wallace) You can answer. How many other officers were involved with this?
A. I don't know. Several.
Q. How did the vehicle stop?
A. What I found out afterwards, and what I heard over the radio from Air One, it was in a collision with another vehicle.
MR. WALLACE: All right. Let me go over some notes real quick. Take like a five-, seven-minute break, if that's all right with everybody.
MR. PORTER: Yep.
(Recess taken.)
MR. WALLACE: Okay. I don't think I have any more questions for you, Officer Hernandez. Thank you very much for your time.
THE WITNESS: Okay. You're welcome. Thank you.

STATE OF OREGON )
) ss.
County of Yamhill )

I, Karen Edwards, a certified shorthand reporter for Oregon, hereby certify that, pursuant to the stipulation of counsel for the respective parties hereinbefore set forth, RYAN HERNANDEZ appeared via Zoom before me at the time and place set forth in the caption hereof; that at said time and place I reported in Stenotype all testimony adduced and other oral proceedings had in the foregoing manner; that thereafter my notes were reduced to typewriting under my direction, and that the foregoing transcript constitutes a full, true and accurate record of all such testimony adduced and oral proceedings had, and of the whole thereof.

WITNESS my hand at McMinnville, Oregon, this 8th day of February, 2025.

CERTIFIED SHORTHAND REPORTER
Oregon
CSR
90-0145
Karen Edwards

Karen Edwards
Certified Shorthand Reporter
Certificate No. 90-0145

**Directive 630.05 Vehicle Interventions and Pursuits**

**Refer:**

- ORS § 164.135, Unauthorized Use of a Vehicle
- Portland Metropolitan Interagency Pursuit Agreement (2012)
- BOEC Memorandum of Understanding (MOU)
- DIR 220.40, Lawsuits and Claims
- DIR 310.20, Retaliation Prohibited
- DIR 600.00, Aircraft Use
- DIR 630.10, Driving Response
- DIR 905.00, Non-Force After Action Reports
- DIR 1010.00, Use of Force
- DIR 1010.10, Deadly Force and In-Custody Death Reporting and Investigation Procedures
- DIR 1500.00, Training

**Definitions:**

- Boxing In: A coordinated tactic of making contact between police vehicles and a suspect's vehicle to stop or prevent the start of a pursuit.

- Marked Unit: An emergency police vehicle equipped with overhead lights.

- Pursuit: An active, deliberate attempt by one or more members to apprehend one or more occupants of another moving vehicle, when it is reasonably apparent that the driver of that vehicle is aware of that attempt and is resisting apprehension by increasing speed, disobeying traffic laws, or attempting to elude the officer through evasive maneuvers or tactics.

- Pursuit Intervention Technique (PIT): A driving technique designed to stop a fleeing motorist safely and quickly by making contact with the fleeing car at a specific point on the vehicle, which throws the car into a spin and brings it to a stop.

- Ramming: The use of an emergency (police) vehicle, other than in a pursuit intervention technique or boxing in maneuver, to purposely cause contact with another vehicle in order to disable the vehicle.

- Stop/Spike Strips: Devices used to deflate tires in a controlled fashion.

- Vehicle: For purposes of this Directive, a vehicle is a motorized vehicle.

- Vehicle Intervention Strategies: Tactics which may be used to stop or reduce the speed of a fleeing vehicle in an attempt to reduce safety risks posed to the community, the suspect, and members (e.g. barricading, boxing in, pursuit intervention technique, ramming, stop/spike strips).

**Policy:**

1. The Bureau recognizes that vehicle pursuits are dynamic and rapidly evolving in nature and, as a result, have inherent safety risks. Therefore, members are expected to be able to articulate their decision-making with regard to pursuits, and for engaging in and/or continuing a pursuit. The choice to engage in and/or continue a pursuit shall be objectively reasonable under the totality of circumstances.

2. Members shall be trained in pursuit management. In an effort to uphold the Bureau's commitment to protecting human life and property, members must balance the safety risks posed to the community against the benefit of capture before initiating and while continuing the pursuit.

**Procedure:**

1. Pursuit Authorization.
   - 1.1. Members shall only initiate a pursuit of a suspect fleeing in a vehicle when there is reasonable suspicion to believe the suspect committed a felony person crime or where the suspect's driving conduct, prior to the initiation of a stop, displays a willful disregard for the safety of others that reasonably places the public in immediate danger of serious bodily harm or death.

   - 1.2. Members shall not engage in a pursuit under the following circumstances:
     - 1.2.1. The suspect's identity is known and the suspect can be apprehended at a future time, and if the suspect's driving behavior, prior to the initiation of a stop, does not place the public in immediate danger of serious bodily harm or death.
     - 1.2.2. Police vehicles carrying suspects, complainants or witnesses shall not become involved in pursuits.
     - 1.2.3. Cadets shall not become involved in pursuits.

   - 1.3. Members shall disengage from a pursuit under the following circumstances:
     - 1.3.1. If the member is driving any vehicle other than a four-wheeled pursuit-rated marked unit when a pursuit is initiated, that member shall disengage primary pursuit when a four-wheeled pursuit-rated marked unit is in position to assume the pursuit. The disengaging unit may follow at a safe distance until the conclusion of the pursuit.
     - 1.3.2. Police vehicles carrying passengers other than members, including ride-alongs, chaplains or cadets, shall disengage primary pursuit when a four-wheeled pursuit-rated marked unit is in position to assume the pursuit.
     - 1.3.3. The pursuit has entered another jurisdiction, another agency has taken over the primary role in the pursuit, and the other agency has adequate cover present.
     - 1.3.4. If a collision occurs as a result of the pursuit that is reasonably likely to require immediate medical assistance and more than one police vehicle is in pursuit, at least one pursuing member shall disengage from the pursuit and render appropriate aid while the other members continue pursuit. If only one police vehicle is in pursuit and a collision occurs as a result of the pursuit that is reasonably likely to require immediate medical assistance, but the benefit of

"DO NOT ... FROM HISTORICAL FILE"

capture outweighs disengagement, the pursuing member must call for immediate backup to render appropriate aid; the involved member may continue the pursuit.

1.3.4.1. For minor accidents not requiring immediate medical assistance, supporting members who are not engaged in the pursuit shall respond to the scene of the accident.

1.3.4.2. If a member is involved in a collision, they will immediately broadcast that information.

1.4. When a member initiates a pursuit that they reasonably believe constitutes an extraordinary circumstance, the member shall immediately notify their supervisor of the pursuit and must receive permission to continue the pursuit.

2. Pursuit Balancing Factors.

2.1. The below factors should be taken into consideration before deciding to initiate a pursuit, and these factors should be reassessed on an ongoing basis in deciding to continue or reengage in a pursuit. Members must be able to articulate reasons why the benefit of capture outweighs the safety risks posed to the community in the pursuit. Members must terminate a pursuit when the safety risks posed to the community clearly outweigh the benefit of capture. Key factors include:

2.1.1. The seriousness of the offense committed, and the risk the suspect(s) poses to the community.

2.1.2. The suspect's driving behavior and vehicle condition, as well as the presence of passengers in the fleeing vehicle.

2.1.3. The member's knowledge of the area(s), proximity of cover and feasibility of implementing pursuit intervention strategies.

2.1.4. The type of area, volume and presence of other vehicles and/or pedestrian traffic, and environmental and visibility conditions.

3. Member Responsibilities.

3.1. Only a maximum of three units shall engage in a pursuit with lights and sirens continuously activated. Upon initiation, at least one member in the pursuit shall frequently broadcast pertinent information (e.g. location, speed, direction, conditions, requests for specific interventions, etc.). The primary unit shall immediately notify the Bureau of Emergency Communications (BOEC) of the reasons for the pursuit and stay involved in some capacity until termination.

3.1.1. Exceptions to the three unit maximum may be authorized by a supervisor under very limited circumstances and only when an unusually dangerous situation dictates (e.g. multiple dangerous suspects, shots fired, armed robbery, etc.). Supervisory approval for additional pursuit vehicles must be authorized by voice over the air.

3.1.2. The decision to attempt to use a pursuit intervention technique maneuver will not alone be a justification for a fourth unit.

3.2. The managing supervisor will announce their role over the radio, declare if the pursuit is authorized to continue, and respond to the area of the pursuit; supervisors involved in the pursuit shall not assume management responsibilities.

3.3. Involved members and the supervisor should remain on the initial talk group (precinct dispatch net).

3.4. Other members/units in the general vicinity of the pursuit who are not directly involved may proceed with caution to a position that would assist in perimeter support or to deploy stop/spike sticks.

3.5. When feasible, the Air Support Unit will become the primary unit in a pursuit. The ground units will continue at a safe distance and at a reduced speed to respond and take control at the conclusion of the pursuit. The managing supervisor will maintain overall control of the pursuit and potential use of intervention strategies.

4. Pursuit Intervention Strategies and Standards.

4.1. Members may only employ pursuit intervention strategies that are Bureau approved and that they have been trained to use.

4.2. Members may use the pursuit intervention strategies listed below with lights/siren warnings when it is objectively reasonable to do so under the totality of the circumstances.

4.3. When feasible, it is the supervisor's responsibility to ensure pursuit intervention strategies are planned and deployed as soon as practical.

4.4. Members should, if time and circumstances permit, continually broadcast their intentions and actions as they use pursuit intervention strategies.

4.5. Members may use the following Bureau-approved strategies. Unless otherwise noted, these strategies shall implicate force.

4.5.1. *Boxing In*: This tactic may be employed preemptively, meaning without lights/siren warnings, if a pursuit of the subject vehicle would be permitted under Section 1.1. of this directive. This tactic may also be employed preemptively in a static environment (e.g., the driver appears incapacitated or unconscious; the subject vehicle is stationary in a parking lot) if the benefit gained outweighs the inherent risks of the maneuver. Finally, this tactic may be employed preemptively in a dynamic environment (e.g., the subject vehicle is temporarily stopped at a traffic control device) when there is probable cause to arrest a suspect in a vehicle and the totality of the circumstances indicates the suspect will attempt to avoid detention and arrest, or when the suspect's driving behavior displays a willful disregard for the safety of others which reasonably places the public in immediate danger of serious bodily harm or death. As described in Directive 1010.00, Use of Force, boxing in will be investigated as a Category IV use of force, if conducted at speeds at or below 20 miles per hour in conjunction with training. If the tactic is conducted at speeds above 20 miles per hour, the intent and manner in which the technique is used shall be considered to determine the appropriate category of force, as described in Directive 1010.00, Use of Force. Members are

"DO NOT R... FROM HISTORICAL FILE

required to provide substantial justification under these circumstances, and supervisors have the discretion to elevate the category of the force investigation.

4.5.2. *Pursuit Intervention Technique*: This tactic shall not be used on two-wheeled vehicles, passenger-occupied buses, and vehicles transporting hazardous materials. This tactic may be employed preemptively, meaning without lights/siren warnings, when there is probable cause to arrest a suspect in a vehicle and the totality of the circumstances indicates the suspect will attempt to avoid detention and arrest, or when the suspect's driving behavior displays a willful disregard for the safety of others which reasonably places the public in immediate danger of serious bodily harm or death. As described in Directive 1010.00, Use of Force, the PIT maneuver will be investigated as a Category III use of force, if conducted at speeds at or below 45 miles per hour in conjunction with training. If the tactic is conducted at speeds above 45 miles per hour, the intent and manner in which the technique is used shall be considered to determine the appropriate category of force, as described in Directive 1010.00, Use of Force. Members are required to provide substantial justification under these circumstances, and supervisors have the discretion to elevate the category of the force investigation

4.5.3. *Ramming*: Members should only employ this tactic in extraordinary circumstances. Any use of ramming requires substantial justification. As described in Directive 1010.00, Use of Force, ramming will be reviewed as a Category II use of force; however, supervisors have the discretion to elevate the category of the force investigation. The intent and manner in which the technique is used shall be considered when making the determination to elevate the investigation.

4.5.4. *Stop/Spike Strips*: This tactic is not considered force.

5. Pursuits Involving Other Jurisdictions.

5.1. For pursuits coming into the Bureau's jurisdiction from another jurisdiction, the managing supervisor will determine whether members will become involved in the pursuit. If the supervisor determines that the Bureau will assist in the pursuit, members may only engage in the pursuit consistent with this policy, regardless of the policies of the originating jurisdiction.

5.2. For pursuits beginning in Bureau jurisdiction but leaving from this jurisdiction, it is the responsibility of a member of the primary pursuing unit to: 1) inform the receiving jurisdiction of the conditions giving rise to the pursuit and the actions taken during the pursuit; and 2) request assistance from the receiving jurisdiction. If the receiving jurisdiction agrees to assume primary control of the pursuit, once that transfer occurs, the Bureau will only continue the pursuit in a supporting role. If the receiving agency elects to terminate the pursuit while in that jurisdiction, PPB members will also terminate the pursuit.

5.3. Supervisors shall manage notification and direct control of pursuits that either extend into or are received from other jurisdictions, including the State of Washington.

6. Pursuit Termination.

6.1. Members must terminate a pursuit when the safety risks posed to the community clearly outweigh the benefit of capturing the suspect. Termination may be called by any sworn member, whether involved in the pursuit or not. Members will terminate a pursuit when ordered to do so by any supervisor. Members will terminate a pursuit that travels into the State of Washington, unless the underlying offense is a violent person-to-person felony.

6.2. Once a pursuit is terminated, involved members shall verbally acknowledge the termination over the radio, disengage and stop following the suspect vehicle. If involved in the pursuit, the Air Support Unit may continue to monitor the fleeing vehicle, but reengagement by ground units is limited by Section 7 of this Directive.

6.3. Per Directive 310.20, Retaliation Prohibited, members shall not retaliate against involved members regarding the decision to terminate a pursuit.

6.4. Members shall refer concerned property owner(s) whose property may have been damaged during a pursuit to the City of Portland's Risk Management Office, in accordance with Directive 220.40, Lawsuits and Claims.

7. Pursuit Reengagement.
   7.1. After termination, a member may reengage a pursuit of the suspect vehicle only if the member is able to articulate new reasons why the benefit of capture outweighs the safety risks posed to the community as a consequence of the pursuit (See Section 1, Pursuit Authorization and Section 2, Pursuit Balancing Factors).

8. Reporting.
   8.1. Involved members shall complete an appropriate police report detailing the pursuit in accordance with directives, and supervisors will complete any required force investigations in accordance with Directive 1010.00, Use of Force, or Directive 905.00, Non-Force After Action Reports. The intervention strategies detailed above when used on a subject's vehicle are not accidents, and thus do not require accident related investigation and reporting.

9. Supervisor Responsibilities.
   9.1. In managing a pursuit, supervisors shall:
      9.1.1. Determine if the pursuit is prohibited.
      9.1.2. Continually balance the safety risks posed to the community against the benefit of capture in managing the pursuit.
      9.1.3. Authorize and direct additional units to engage in a pursuit.
      9.1.4. Ensure radio communication between all applicable parties.
      9.1.5. Devise, approve and direct appropriate pursuit intervention strategies to end a pursuit as quickly as possible, so as to avoid or mitigate safety risks.
      9.1.6. Manage notification and direct control of pursuits that either extend into or are received from other jurisdictions.
      9.1.7. Order the pursuit be terminated when necessary (e.g., members are not adequately broadcasting updates, intervention strategies are not being planned or

"DO NOT REMOVE
FROM HISTORICAL FILE"

implemented, the safety risks posed to the community clearly outweigh the benefit of capture).

9.1.7.1. If ordering termination of a pursuit, verify with the involved member(s) their location at the time of the pursuit termination and document that location in the After Action Report.

9.1.8. Ensure reports are completed in accordance with directives.

9.1.9. Conduct a debriefing with all involved members. The debrief should include an overview of the pursuit and, when applicable, a discussion of any vehicle intervention strategies employed. Confirm that the debrief occurred in the After Action Report.

9.1.10. Complete an after action review and follow reporting requirements based on the category of force outlined in Direction 1010.00, Use of Force, and determine whether higher scrutiny is warranted based on the speed at which the vehicle intervention strategy was used pursuant to Section 4.4.

9.1.10.1. If no force is used, supervisors shall conduct a pursuit after action investigation pursuant to Directive 905.00, Non-Force After Action Reports.

10. Command Staff Responsibilities.

10.1. The Assistant Chief of Operations, or designee, shall prepare an annual report analyzing Police Bureau pursuits.

10.2. Command staff shall review the annual report, discuss trends, identify gaps, and direct necessary policy and training updates in accordance with Directive 1500.00, Training.

**History:**

- Originating Directive Date: 09/06/01
- Last Revision Signed: 01/10/2020
    - Effective Date: 02/09/2020
- Next Review Date: 02/09/2022

Jami Resch

Chief of Police
01/10/2020 12:40 PM

AGGRAVATED ASSAULT

# Portland Police Bureau

GOVERNMENT AGENCY RELEASE

CASE NUMBER
**GO 42 2022-113627**

| FOLLOWUP REPORT #17 | | | | |
|---|---|---|---|---|
| ASSIGNED TO<br>BYRD, MCCAGEOR A (48348) | RANK | | | |
| ORG UNIT<br>CENTRAL | CAPACITY<br>1-PATROL SUPPLEMENTAL | | | |
| ASSIGNED ON<br>04/29/2022 | ASSIGNED BY<br>BYRD, MCCAGEOR A | SUBMITTED ON<br>04/29/2022 | APPROVED ON<br>05/02/2022 | APPROVED BY<br>HOLBROOK, M JOHN (RETIRED) |

**NARRATIVE**

| AUTHOR | DATE/TIME |
|---|---|
| BYRD, MCCAGEOR A (48348) | 04/29/2022 1644 |

SUBJECT
OHSU - INJURY AND VICTIM INT

Sgt. Holbrook #32026 Ofc. Dow #40590 Ofc. Martiniuc #52442

I responded to OHSU following a two-vehicle crashing involving two pedestrians. Call information indicated that a stolen vehicle was located and subsequently eluded police after a stop was attempted. There were no police chasing the suspect vehicle, but the Air Unit was following, undetected. The Air Unit was broadcasting all of the reckless driving until it ran a stop sign, hitting another vehicle, before hitting two pedestrians. The suspects then fled on foot.

The two pedestrians were transported to OHSU. I first spoke with VELEZ in the ER. VELEZ told me that he and IRWIN left their home and were walking to Baby Doll Pizza (2835 SE Stark St) for dinner. They walked east on SE Pine St and were crossing SE 26th Ave when they noticed a fast approaching vehicle on Pine. As they were in the middle of 26th, they saw the suspect vehicle also approaching at a high rate of speed, northbound towards them, on 26th. VELEZ yelled to IRWIN "oh my god!" and they tried to get out of the road because VELEZ believed the suspect vehicle was not going to stop at the stop sign, and likely hit them in the street. Just then, the two vehicles collided in the intersection (suspect vehicle ran the stop sign) and the suspect vehicle struck VELEZ and IRWIN. VELEZ didn't remember the suspect vehicle actually hitting him, but regained consciousness when AMR was with him. VELEZ currently has a broken jaw, but nothing else reported.

I then went to check on IRWIN in the ICU. Ofc. Martiniuc was there with the intubated and unconscious IRWIN. IRWIN was only responding slightly to pain, but was not medicated and not waking up on his own. IRWIN has numerous injuries all over his body, the most noted would be a large laceration/break on his forehead. Medical staff would only indicate that IRWIN's vitals were currently stable, but would not comment on short or long-term prognosis. I was told by staff that there would be a drain put into IRWIN's skull that would relieve and assess pressure; IRWIN has a brain bleed. The next critical information point would be around 1AM during the next CT scan.

FED arrived and took pictures of both victims and clothing. Ofc. Martiniuc entered the clothing into property. VELEZ was given a business card and case number for follow-up. VELEZ was likely going to be discharged from OHSU.

See additional.

# IN THE CIRCUIT COURT OF THE STATE OF OREGON FOR THE COUNTY OF MULTNOMAH

| | | |
|---|---|---|
| State of Oregon, | ) | |
| Plaintiff | ) | |
| | ) | Case No.: 22CR49538 |
| vs. | ) | |
| | ) | JUDGMENT |
| | ) | |
| Joseph Gary Sumner, | ) | Case File Date: 10/12/2022 |
| Defendant | ) | District Attorney File #: 2448049-1C |

## DEFENDANT

True Name: Joseph Gary Sumner

Sex: Male

Date Of Birth: 10/04/1972

Fingerprint Control No (FPN): JMUL122366805

## HEARING

Proceeding Date: 06/30/2023
Court Reporter: Recording, FTR

Defendant appeared in person and was in custody. The court determined that the defendant was indigent for purposes of court-appointed counsel, and the court appointed counsel for the defendant. The defendant was represented by Attorney(s) Sean Lo, OSB Number 175448. Plaintiff appeared by and through Attorney(s) Charles Z Weiss, OSB Number 220791. Defendant knowingly waived two day waiting period before sentencing.

## COUNT(S)

It is adjudged that the defendant has been convicted on the following count(s):

### Count 1 : Assault in the Second Degree

Count number 1, Assault in the Second Degree, 163.175, Felony Class B, committed on or about 04/29/2022. Conviction is based upon a Guilty Plea on 06/30/2023.

### Sentencing Guidelines

The Crime Severity Classification (CSC) on Count Number 1 is 9 and the Criminal History Classification (CHC) is E.

This sentence is pursuant to the following special factors:

- This is a Presumptive Sentence
- Sentence per ORS 137.700
- Defendant stipulates to causation and liability for additional restitution. Waive all fines, fees and

assessment except for restitution; Leave restitution open for 90 days.

Incarceration

Defendant is sentenced to the custody of Oregon Dept of Corrections, for a period of 70 month(s). Defendant is remanded to the custody of the Multnomah Sheriff for transportation to the Oregon Dept of Corrections for service of this sentence. The Court recommends Southfork or OSP placement. Defendant may receive credit for time served.

The Defendant may not be considered by the executing or releasing authority for any form of Reduction in Sentence, Conditional or Supervised Release Program, Temporary Leave From Custody, Work Release. The Defendant may not be considered for release on post-prison supervision under ORS 421.508(4) upon successful completion of an alternative incarceration program.

Post-Prison Supervision

The term of Post-Prison Supervision is 3 year(s). If the Defendant violates any of the conditions of post-prison supervision, the defendant shall be subject to sanctions including the possibility of additional imprisonment in accordance with the rules of the State Sentencing Guidelines Board.

Statutory Provisions

Defendant is ordered to submit blood or buccal sample and thumbprint pursuant to ORS 137.076.

Monetary Terms

Defendant shall be required to pay the following amounts on this count:

Compensatory Fine/Restitution:

Restitution is ordered to be paid to the court and disbursed to the payee(s) named below.

| Payee | Not To Exceed | Amount |
|---|---|---|
| Jesus Velez Pastrana | | $25,998.63 |
| Aleksey Burlay | | $971.18 |
| Total | | $26,969.81 |

## Count 2 : Failure to Perform Duties of Driver to Seriously Injured Persons

Count number 2, Failure to Perform Duties of Driver to Seriously Injured Persons, 811.705(3)(b), Felony Class B, committed on or about 04/29/2022. Conviction is based upon a Guilty Plea on 06/30/2023.

Sentencing Guidelines

The Crime Severity Classification (CSC) on Count Number 2 is 8 and the Criminal History Classification (CHC) is E.

This sentence is pursuant to the following special factors:

- This is a Presumptive Sentence
- Waive all fines, fees and assessments except for restitution; Leave restitution open for 90 days.

License Suspension / Revocation

Defendant's Drivers License is Revoked for Permanent.

Incarceration

Defendant is sentenced to the custody of Oregon Dept of Corrections, for a period of 26 month(s). Defendant is remanded to the custody of the Multnomah Sheriff for transportation to the Oregon Dept of Corrections for service of this sentence. Defendant may receive credit for time served.

The Defendant may be considered by the executing or releasing authority for any form of Reduction in Sentence, Conditional or Supervised Release Program, Temporary Leave From Custody, Work Release authorized by law for which the Defendant is otherwise eligible at the time of sentencing. The Defendant may be considered for release on post-prison supervision under ORS 421.508(4) upon successful completion of an alternative incarceration program.

This sentence shall be concurrent with the following cases : count 1 of this case.

Post-Prison Supervision

The term of Post-Prison Supervision is 3 year(s). If the Defendant violates any of the conditions of post-prison supervision, the defendant shall be subject to sanctions including the possibility of additional imprisonment in accordance with the rules of the State Sentencing Guidelines Board.

Statutory Provisions

Defendant is ordered to submit blood or buccal sample and thumbprint pursuant to ORS 137.076.

## Count 4 : Assault in the Second Degree

Count number 4, Assault in the Second Degree, 163.175, Felony Class B, committed on or about 04/29/2022. Conviction is based upon a Guilty Plea on 06/30/2023.

## Sentencing Guidelines

The Crime Severity Classification (CSC) on Count Number 4 is 9 and the Criminal History Classification (CHC) is E.

This sentence is pursuant to the following special factors:

- This is a Presumptive Sentence
- Sentence per ORS 137.700
- Waive all fines, fees and assessments except for restitution; Leave restitution open for 90 days.

## Incarceration

Defendant is sentenced to the custody of Oregon Dept of Corrections, for a period of 70 month(s). Defendant is remanded to the custody of the Multnomah Sheriff for transportation to the Oregon Dept of Corrections for service of this sentence. Defendant may receive credit for time served.

The Defendant may not be considered by the executing or releasing authority for any form of Reduction in Sentence, Conditional or Supervised Release Program, Temporary Leave From Custody, Work Release. The Defendant may not be considered for release on post-prison supervision under ORS 421.508(4) upon successful completion of an alternative incarceration program.

This sentence shall be concurrent with the following cases : count 1 of this case.

## Post-Prison Supervision

The term of Post-Prison Supervision is 3 year(s). If the Defendant violates any of the conditions of post-prison supervision, the defendant shall be subject to sanctions including the possibility of additional imprisonment in accordance with the rules of the State Sentencing Guidelines Board.

## Statutory Provisions

Defendant is ordered to submit blood or buccal sample and thumbprint pursuant to ORS 137.076.

# COUNTS DISPOSED WITH NO CONVICTION

Count # 3, Recklessly Endangering Another Person is Dismissed.

Count # 5, Failure to Perform Duties of Driver to Seriously Injured Persons is Dismissed.

Count # 6, Recklessly Endangering Another Person is Dismissed.

Count # 7, Unauthorized Use of a Vehicle is Dismissed.

Count # 8, Possession of a Stolen Vehicle is Dismissed.

Count # 9, Criminal Mischief in the Second Degree is Dismissed.

Count # 10, Failure to Perform Duties of Driver-Property Damage is Dismissed.

Count # 11, Criminal Mischief in the Second Degree is Dismissed.

Count # 12, Recklessly Endangering Another Person is Dismissed.

Count # 13, Failure to Perform Duties of Driver-Property Damage is Dismissed.

Count # 14, Criminal Mischief in the Second Degree is Dismissed.

Count # 15, Failure to Perform Duties of Driver-Property Damage is Dismissed.

Count # 16, Criminal Mischief in the Second Degree is Dismissed.

Count # 17, Recklessly Endangering Another Person is Dismissed.

Count # 18, Recklessly Endangering Another Person is Dismissed.

Count # 19, Reckless Driving is Dismissed.

If convicted of a felony or a crime involving domestic violence, you may lose the right to buy, sell, transport, receive, or possess a firearm, ammunition, or other weapons in both personal and professional endeavors pursuant to ORS 166.250, ORS 166.291, ORS 166.300, and/or 18 USC 922(g).

## MONEY AWARD INCLUDING RESTITUTION

Judgment Creditor: State of Oregon
Judgment Debtor: Joseph Gary Sumner

Restitution

| Payee | Amount |
|---|---|
| Aleksey Burlay | $971.18 |
| Jesus Velez Pastrana | $25,998.63 |

Payees are to be paid as ordered under Monetary Terms.

Defendant is ordered to pay the following monetary totals, including restitution or compensatory fine amounts stated above, which are listed in the Money Award portion of this document:

| Type | Amount Owed |
|---|---|
| Restitution | $26,969.81 |
| **Total** | $26,969.81 |

The court may increase the total amount owed by adding collection fees and other assessments. These fees and assessments may be added without further notice to the defendant and without further court order.

Subject to amendment of a judgment under ORS 137.107, money required to be paid as a condition of probation remains payable after revocation of probation only if the amount is included in the money award portion of the judgment document, even if the amount is referred to in other parts of the judgment document.

Any financial obligation(s) for conviction(s) of a violation, which is included in the Money Award, creates a judgment lien.

**Payment Schedule**

Payment of the fines, fees, assessments, and/or attorney's fees noted in this and any subsequent Money Award shall be scheduled by the clerk of the court pursuant to ORS 161.675.

Payable to:

**Multnomah County Circuit Court**
**1200 SW First Avenue**
**Portland, Oregon 97204**
**P: 971-274-0545**
**F: http://courts.oregon.gov/multnomah**

Dated the ______ day of 7/11/2023 10:49:59 AM ______, 20______

Signed: ______________________

**Circuit Court Judge Andrew M. Lavin**



PASTRANA_IRWIN-CITY_000269

EXHIBIT 12
Declaration of Michael K. Porter