MICHAEL K. PORTER, OSB No. 211377
Sr. Deputy City Attorney
mike.porter@portlandoregon.gov
ELIZABETH C. WOODARD, OSB No. 075667
Sr. Deputy City Attorney
beth.woodard@portlandoregon.gov
Portland City Attorney's Office
1221 SW 4th Ave., Rm. 430
Portland, OR 97204
Telephone: (503) 823-4047
Facsimile: (503) 823-3089
*Counsel for Defendant City of Portland*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

**PORTLAND DIVISION**

**JESUS VELEZ PASTRANA** and **JOHN G. IRWIN JR.,**

Plaintiffs,

v.

**CITY OF PORTLAND**, a municipal corporation, **JOSEPH GARY SUMNER**, an individual, **SHAUN LEE PALMER**, an individual, and **JOHN** or **JANE DOE**, an induvial,

Defendants.

**Case No. 3:24-cv-00587-AB**

**SUPPLEMENTAL DECLARATION OF MICHAEL K. PORTER**

**(In Support of Defendant City of Portland's Motion for Summary Judgment)**

I, Michael Porter, declare as follows:

1. I am the Senior Deputy City Attorney with the Portland Office of City Attorney assigned to represent Defendant City of Portland in this case.

2. I make this supplemental declaration in support of Defendant City of Portland's Motion for Summary Judgment.

3. Attached to this declaration as **Exhibit 13** is a true and correct copy of excerpts of Susannah Badger's February 25, 2025 deposition transcript.

4. Attached to this declaration as **Exhibit 14** is a true and correct copy of excerpts of Joseph Sumner's March 21, 2025 deposition transcript.

5. Attached to this declaration as **Exhibit 15** is a true and correct copy of excerpts of Garth Meyer's January 28, 2025 deposition transcript.

6. Attached to this declaration as **Exhibit 16** is a true and correct copy of Jesus Pastrana's August 22, 2025 deposition transcript.

7. Attached to this declaration as **Exhibit 17** is a true and correct copy of excerpts of Joseph Sumner's February 20, 2025 deposition transcript.

8. Attached to this declaration as **Exhibit 18** is a true and correct copy of a Google Map showing distance between Tom's and the crash location.

**I hereby declare that the above statement is true to the best of my knowledge and belief, and that I understand it is made for use as evidence in court and is subject to penalty for perjury.**

DATED: September 2, 2025

*/s/ Michael K. Porter*
Michael K. Porter



PORTLAND CITY ATTORNEY'S OFFICE
1221 SW 4TH AVENUE, RM 430
PORTLAND, OREGON 97204
(503) 823-4047

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

JESUS VELEZ PASTRANA and JOHN G. IRWIN JR.,

Plaintiffs,

v.

No. 3:24-cv-00587-AB

CITY OF PORTLAND, a municipal corporation, JOSEPH GARY SUMNER, an individual, SHAUN LEE PALMER, an individual, and JOHN or JANE DOE, an individual,

Defendants.

VIDEO DEPOSITION OF SUSANNAH HOPE BADGER

Taken on behalf of Defendants

* * *

BE IT REMEMBERED THAT, pursuant to the Oregon Rules of Civil Procedure, the video deposition of SUSANNAH HOPE ANNIE BADGER was taken before James D. Gardner, an Oregon Certified Shorthand Reporter and a Registered Professional Reporter, on Tuesday, February 25, 2025, commencing at the hour of 10:35 a.m., in the offices of City Attorney's Office - Portland, 1221 S.W. 4th Avenue, Suite 430, Portland, Oregon 97204.

A I don't know. I'm not sure.
Q Can you see over it?
A No.
Q Okay. So pretty high?
A Yeah. 10:48:32
Q And so if I understand correctly, you would have been driving away from your apartment, towards the intersection, with that wall on your right side?
A Correct.
Q And it goes all the way to the corner? 10:48:44
A It goes -- I mean, not all the way to the sidewalk, but it goes to the corner, and then parked cars are -- some high school event was there that day, so there was parked cars. And it's the skinnier streets in Portland, so it was a pretty tight area. 10:49:01 And it was the first couple of warm days, so there was a bunch of people out. They just happened to be in the intersection. And there's a stop sign for them, but not for me. And I had looked this way and was starting to go this way to look and didn't see them in time for 10:49:23 them to hit me.
Q Okay. So I want to talk about all that a little bit more and just walk through step by step. There's this high school activity going on, so there's cars everywhere, there's people out, because it's a nice 10:49:41

CERTIFICATE

I, James D. Gardner, a Registered Professional Reporter, Washington Certified Court Reporter, and Oregon Certified Shorthand Reporter, hereby certify that said witness personally appeared before me at the time and place set forth in the caption hereof; that at said time and place I reported in stenotype all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were transcribed through computer-aided transcription, under my direction; and that the foregoing pages constitute a full, true and accurate record of all such testimony adduced and oral proceedings had, and of the whole thereof.

I further certify review of the transcript was not requested.

Witness my hand at Vancouver, Washington, this 4th day of March, 2025.

James D. Gardner
Oregon CSR No. 23-0103
Expires 3/31/2026
Washington CCR No. 23007586
Expires 3/13/2025

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | | |
|---|---|---|
| JESUS VELEZ PASTRANA and JOHN G. IRWIN, JR., Plaintiffs, | ) | |
| vs. | ) | 3:24-cv-00587-AB |
| CITY OF PORTLAND, a municipal corporation; JOSEPH GARY SUMNER, an individual; SHAUN LEE PALMER, an individual; and JOHN or JANE DOE, an individual, Defendants. | ) | |

VIDEO-RECORDED DEPOSITION OF JOSEPH GARY SUMNER

Taken on Behalf of Defendant City of Portland

March 21, 2025
VOLUME II

BE IT REMEMBERED that, pursuant to notice and the Federal Rules of Civil Procedure, the deposition of JOSEPH GARY SUMNER was continued before Susan G. Walker, an Oregon Certified Shorthand Reporter, on Friday, the 21st day of March, 2025, commencing at the hour of 9:50 a.m.; the witness responding to questions via videoconference from Ontario, Oregon; the questions propounded and proceedings reported remotely via videoconference.

a sanctuary?

A Yeah, I knew that, like, once I got -- when I pulled out of the parking lot, I went to the first light and I turned left. And I felt like at that point, like there was no -- you know, from Division to Hawthorne is 10:57:02 a little bit of a longer stretch than it is from, say, Division to Powell, or from Hawthorne to Belmont, which I couldn't remember last time. Or from Belmont to Stark or from Stark to Burnside. You see, there's a little bit more of a stretch, because that road that's in the middle, 10:57:19 I want to say -- maybe it's like Lincoln or something -- it's one of the presidents' names -- that's between Division and Hawthorne is a further stretch. And so getting from Division to Hawthorne was a little bit more of a stretch than what I'm used to. And so it was scary. 10:57:37 It was scary for me. And so I felt like at that point that I really needed to put the pedal to the metal and get to Hawthorne and get somewhere.

You know, Hawthorne was the first place I went to in 1995, back when it was, like, 26th and Hawthorne. 10:57:55 Back when there was an Arby's there. Back when the hippies were -- you know, I shacked up with a beatnik right off of 26th and Hawthorne at that point.

At that point I could have made better decisions with my life. I could have done something way different 10:58:17

the noise in the vehicle. Like, the guy especially, man, he was almost to the point where -- I think that was part of the reason that I might have sped up, was just to avoid him, like, jumping on me or something, because he wanted out so bad. 11:03:21

Q And you don't remember the vehicle operating any differently?

A I really don't. I really don't. The only time I know that it was messed up is when I went through that, you know, that intersection, and then -- and it started 11:03:40 wobbling. And it sounds like -- it seems like I might have at some point, I might have heard something scraping. I might have -- yeah. I heard something scraping. And I know that we wobbled into a few cars on the side. And I know you've shown me the video a few times, and I still 11:04:01 don't recall ever seeing either one of the victims before or after, how they were hit. I still -- maybe my brain is blocking it from you showing it to me. I'm not sure. And I hope it's not. But I still don't understand how they got hit. Because if I had seen them, I'd have just tipped 11:04:21 the vehicle over. I'd have crashed into a car. I'd have never ever aimed a vehicle at another human being and ran them over. It just never would have happened, no matter what drugs I'm on.

Remember, I got here from the Grateful Dead. 11:04:41

chases in the city of Portland. And so to get these, you know -- it's more like the initial confrontation, you'll see the police, you'll see the cops, and once they know, they'll follow you. They'll do the speed limit for a minute, but then they just -- the minute you pull into a neighborhood, they're gone. And so that was pretty much what happened. 11:43:46

The only problem was that I didn't really pull into a neighborhood. If you remember what I said, between Division and Hawthorne there's a red light. And that street is kind of like a main road, because it's pretty much the same distance from Hawthorne to that street. It might be Lincoln. It could be -- I'm not sure what the name of that road is where I turned left. Okay? But I know that it's the same distance. So it makes the distance from Division to Hawthorne further than the distance from, say, Hawthorne to Stark or Hawthorne to Belmont. 11:44:03 11:44:20

So when you're being chased by the police, it ends the minute you turn into -- either you go over the speed limit or you turn into a neighborhood. The chase is over. So it's just a matter of getting out of sight at that point and getting off of the cameras that are just everywhere. Jack Black, that movie, Enemy of the State, wasn't good for the mentality of any meth addict. 11:44:35 11:44:54

I just kept going down that street. But I never -- I don't remember ever seeing him behind me at any point.

But it was at that point that I was like, okay, this network has been set up. This fishnet is set up. Because I know that -- I'm smart enough to know that, no matter where you go, if you're not out of that vehicle, that you're done, you're gonna get -- you can't -- you know. 11:46:44

And so there was no point where it was an actual chase. So when I say police chases, they never last more than 30 to 60 seconds. Any chase I've ever been in, except for one, and it was at night, and I thought I had gotten away. I thought because I had cut through a neighborhood and it was late at night and it was off of 82nd and Powell. So if you'll understand why I went down in numbers, it's not hard to figure that out, why I would go down in numbers. And I thought I had gotten away one night. And I got out, I walked a few blocks, and I was done. And I was like, oh, man, how did you guys do that? You know? Like, how did you do that? You know? It's aerial technology. 11:47:01 11:47:21 11:47:44

So a police chase is like this. There's the cops. You've got to turn into any side street and you're okay, because they're not coming in that neighborhood. They're not going to take a chance on hitting somebody. 11:48:01

CERTIFICATE OF REPORTER

I, SUSAN G. WALKER, an Oregon Certified Shorthand Reporter, Registered Professional Reporter, and Federal Certified Realtime Reporter, hereby certify that JOSEPH GARY SUMNER appeared via videoconference before me at the time and place set forth in the caption hereof; that at said time I reported by means of machine shorthand all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were transcribed by me personally, and that the foregoing pages constitute a full, true and accurate record of all such testimony adduced and oral proceedings had, and of the whole thereof.

I further certify that review of the transcript was waived.

WITNESS my hand at Portland, Oregon, this 30th day of March, 2025.

SUSAN G. WALKER, FCRR, RPR
Oregon CSR No. 90-0195
Expires 9/30/2026

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| Jesus Velez Pastrana, and John G. Irwin Jr., Plaintiffs, vs. City of Portland, a municipal corporation, Joseph Gary Sumner, an individual, Shawn Lee Palmer, and John or Jane Doe, an individual, Defendants. | Case No. 3:24-cv-00587-AB |

ZOOM DEPOSITION

of

GARTH MEYER

January 28, 2025

And then we were waiting for resources. And prior to making contact with the box truck, it left the parking lot.

Q. Where were you at in relation to the box truck while it was at Tom's Diner?

A. I would have been right at 39th and Division.

Q. Okay. That would have been one of the exits out of Tom's Diner?

A. It was not the exit. It was like the actual -- like by the intersection. I was at the corner. I was around the side of the building.

Q. Was your vehicle facing an exit though?

A. Yes.

Q. Okay. And that would have been the initial exit that the occupants tried to -- or at least creeped forward and saw you; is that right?

A. I don't know. I never saw the box truck at Tom's bar.

Q. You were the officer -- you were an officer on the scene, right?

A. Yeah. But I was, again, around the corner, not trying to give ourselves away until I was ready to make contact.

Q. I'm going to see if I can pull this video up. I just want to get a little bit of perspective on this.

car.

Q. We'll let this play for a quick second.

A. I wasn't the first car that you're talking about.

Q. You weren't the first car?

A. No. I came off of 39th.

Q. Okay. I don't know why this switched.

A. Cesar Chavez.

Q. So you're either that one, that one, but not this one, correct?

A. Correct.

Q. Do you know which officer this is?

A. I believe it's Officer Martiniuc, the primary officer.

Q. Officer Martiniuc. Got it. Officer Hernandez is probably over here somewhere?

A. I have no idea.

Q. So walk me through the call. Why were you arriving?

A. To make contact with the stolen vehicle.

Q. What was your protocol? I mean, what were you supposed to do? Just make contact with it?

A. We have some training, things like a static or dynamic box in. I don't remember the conversation, other than us knowing that it was a larger vehicle, that

it would be difficult to box in safely. And so I believe we were just waiting for additional resources, given the size of the vehicle we were attempting to contact.

Q. Since you brought this up, I think it's a great time to talk about this. Okay?

So you talked about dynamic versus static boxing in. Why couldn't you guys have boxed it in over here, what was the determination for why that wasn't possible?

A. I don't know that we were in place when it was over there. I didn't see the vehicle. I was just getting updates.

Q. Okay. So maybe Officer Martiniuc would be better to describe why he didn't -- it does look like he was there, right?

A. I'm not sure. From my vantage point, it looks like he's still blocked by the building, I don't know what he saw.

Q. It does appear to be two -- this is a police vehicle, correct?

A. Appears to be.

Q. This appears to be a police vehicle?

A. Yes.

Q. Okay. So at this point, would you say that

strips? I think we call them spike strips. Is that what you're referring to?
A Yeah.
Q Did you notice whether they got underneath the truck as you drove by. Did you see if they impacted the truck at all? 11:02:03
A I wasn't sure.
Q Okay.
A I wasn't sure. I assumed I ran them over, and that maybe the tire didn't pop maybe. 11:02:16
Q So between the time that you left Tom's Bar and the time you abandoned the truck, did the vehicle drive as if it had a flat?
A Did what?
Q Did the vehicle feel like it had a flat? 11:02:32
A No.
Q Did you feel like it was harder to slow down or turn at all than it had been?
A No, I really didn't.
Q All right. So you also said that you saw SUV's that were police cars. Is that because -- were they marked police cars? 11:02:47
A Yes.
Q Okay. So you could see that the police were in the area. 11:03:00

www.LNScourtreporting.com

A Yeah. I seen that they -- and I knew that, like, they were looking for me.

Q Did they have their lights on, their overhead lights?

A No. The one was like -- there was one, he was parked, and he was, like, standing in front of his -- standing in front of his SUV. I mean, if my memory serves right, I'm pretty sure that's what. And that was where I decided to turn right and go towards Hawthorne. The whole time I was just trying to find any spot to park and just jump out of the truck and get out and run on foot, you know. 11:03:13 11:03:33

Q And you don't need to talk about the specifics, but it sounds like you'd done this a few times before.

A I had been in a situation, in a few situations, yeah. And, like, when I was on meth my instant reaction was always just to run. And whenever they catch me I'm always very -- I would always be very cooperative with them. I would say, hey, you know, hey, I'm not trying to -- you know. 11:03:49 11:04:07

Q It sounded like you had a plan. So head to the neighborhood. That was part of the plan?

A And just get out and run. My only plan really, you know, I really couldn't really plan it out. It's, like I said, when neurotransmitters react, it's like there 11:04:20

www.LNScourtreporting.com

is no thought process. There's just, like, okay, go. And then, like, okay, pull into the neighborhood and get out, you know. And so my plan really was just ultimately just to get out of the truck and run, if I could.
Q I appreciate that. It sounds like you were just looking for a place where you didn't see police to do that. 11:04:38
A Yeah.
Q And so when that didn't happen, you were looking for a supermarket or someplace where there was a lot of people to disappear into, that you mentioned Safeway? 11:04:53
A Yeah. Like, well, you know, by the time I got over there I remembered that -- I was like, okay, we're by the Safeway, maybe we can park by the Safeway and just run in there and eat lunch like we belong here, you know, or something like that, you know. 11:05:10
Q Okay.
A Or jump on a bus. Basically I wanted to jump on the bus when I get closer to Hawthorne.
Q Yeah. Which Safeway are we talking about? Do you remember where it was located? 11:05:23
A On Hawthorne. Safeway on Hawthorne.
Q By 39th. Sorry. Go ahead.
A About 26th or so. 20-something and Hawthorne.
Q And why didn't that work out?
www.LNScourtreporting.com
A I seen a couple police vehicles in between, 11:05:35

between Tom's Bar and that point.
Q Okay. And so then I know these weren't, like, pre-planned. You explained that it's more instinct because of the way that meth works. But try to find a bus or a place where there weren't police, and run from 11:05:52
the truck or get on a bus and get away. That was the next ----
A Any quick route out. Any way to just get out of this truck and not be in it, you know. Because at that point it's like the truck is the magnet. Just get out of 11:06:07
it, get away from it. Just get away.
Q And so I want to make sure I have the timing right. When you realized that none of those plans were going to work and you said to the two people in the truck, good luck, is that what you said? 11:06:25
A Pretty much. I said, hey, I'm going to stop the truck. You know, we're stopping. You know, I'm trying to stop right now, because, the guy, you know, he was freaking out. He was like, you know -- he was like, hey, man, come on, man, you know. I was like, don't worry, 11:06:40
we're stopping right now. And I was like, are they still back there? He was like, yeah, they're back there.
Q That was before you came to the intersection where you were hit that that conversation took place?
A That was right, you know, probably a few seconds 11:06:59

A I did. I seen a few, I want to say two -- at least two times I recognized police vehicles. One time he was just parked, and he was, like, I want to say, just in front, standing in front of his vehicle. And that was just in the residential area between, you know, I would 11:11:44 say probably about around 30th and somewhere halfway between Division and Hawthorne. You know, somewhere in that area, in those few streets, I noticed one. And then I noticed another one when I was at, not Hawthorne, the next one down, the next main road. I noticed that there 11:12:10 was an officer. And he had his lights on. And that's when I went up the hill.

I was a little reckless at that point with driving through that intersection, which was at that point I was just like, look, I was just trying to get out. And 11:12:26 my passenger was like, look, man, we need to stop, just please, you know. I was like, don't worry, we're going to make it, you know; we'll get out of this somehow, you know.

Q So there was one officer that had his lights on. 11:12:40 And you saw a couple other patrol cars during this time. Is that correct?

A Well, the officer that I seen between Division and Hawthorne, I don't believe his lights were on. I don't believe it, though. I could be wrong. I could be 11:12:59

wrong. I mean, this was, like, really fast. But I believe he was out of his car, and he was just kind of, like -- kind of like -- and I knew that he was waiting for me, you know. Or I felt like he was. I can't, you know, guarantee. But I do believe that, you know, he was going to, you know, try to. 11:13:22

So I made a turn, and I didn't see him behind me. And then when I got up to the next main road past Hawthorne, I remember going through Hawthorne. I want to say that I -- but I know that whatever the main road is just past Hawthorne, I know I was going really fast. And at that point it became slightly reckless. 11:13:40

And then when we got to Stark I was like -- I can't remember if I noticed any at Stark or not. But I knew -- I felt like when I reached Stark that I was almost away, that I had pretty much -- that they stopped chasing. There was this rumor or something that after so many blocks they won't chase you. And they weren't really chasing me. They were just, I believe, just, you know, they just wanted me to stop, you know. 11:14:05 11:14:29

Q So how long after that point where you believe they didn't chase any more did you get hit?

A How long what? Sorry about that.

Q Sorry. I can ask it a better way. You said I got to a certain point and I was like, they're not chasing 11:14:46

STATE OF OREGON )
) ss.
County of Yamhill )

I, Karen Edwards, a certified shorthand reporter for Oregon, hereby certify that, pursuant to the stipulation of counsel for the respective parties hereinbefore set forth, GARTH MEYER appeared via Zoom before me at the time and place set forth in the caption hereof; that at said time and place I reported in Stenotype all testimony adduced and other oral proceedings had in the foregoing manner; that thereafter my notes were reduced to typewriting under my direction, and that the foregoing transcript constitutes a full, true and accurate record of all such testimony adduced and oral proceedings had, and of the whole thereof.

WITNESS my hand at McMinnville, Oregon, this 8th day of February, 2025.

CERTIFIED SHORTHAND REPORTER
Oregon
CSR
90-0145
Karen Edwards

Karen Edwards
Certified Shorthand Reporter
Certificate No. 90-0145

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

JESUS VELEZ PASTRANA and JOHN G. IRWIN, JR,.,

Plaintiffs,

vs.

CITY OF PORTLAND, a municipal corporation, JOSEPH GARY SUMNER, an individual; SHAUN LEE PALMER, an individual, and JOHN or JANE DOE, an individual,

Defendants.

Case No. 3:24-cv-00587-AB

VIDEOCONFERENCE DEPOSITION OF JESUS VELEZ PASTRANA

Taken on behalf of Defendants

BE IT REMEMBERED THAT, pursuant to the Federal Rules of Civil Procedure, the videoconference deposition of JESUS VELEZ PASTRANA was taken before Traci R. Moore, a Professional Court Reporter and Notary Public, on Friday, August 22, 2025, commencing at the hour of 1:04 p.m.; the witness responding to questions by videoconference from 1414 North Clarkson Street, Denver, Colorado; the questions being proupounded and proceedings reported remotely.

APPEARANCES

FOR THE PLAINTIFFS:

WALLACE LAW FIRM, PC
By: David T. Wallace
732 Southwest Barnes Road
Suite 421
Portland, Oregon 97225
(503) 208-2950
david@dtwallace.com
(Appearing via videoconference.)

FOR THE DEFENDANTS:

PORTLAND CITY ATTORNEY'S OFFICE
By: Michael K. Porter
1221 Southwest Fourth Avenue
Room 430
Portland, Oregon 97204
(503) 823-4047
mike.porter@portlandoregon.gov
(Appearing via videoconference.)

ALSO PRESENT: Gretchen Magarro, Videographer
Amanda Armenta, Paralegal

* * *

G E N E R A L  I N D E X

WITNESSES

ALL WITNESSES: PAGE:

For Defendants:

Jesus Velez Pastrana:
Examination by MR. PORTER 5
Examination by MR. WALLACE 53

P R O C E E D I N G S

Friday, August 22, 2025

VIDEOGRAPHER: This is the video deposition of Jesus Pastrana in the matter of Jesus Pastrana versus The City of Portland, et al, being held in the United States District Court, the District of Oregon, Portland Division, Case No: 3:24-cv-00587-AB. 13:04:01

Today's date is August 22nd, 2025. We're going on the record at 1:04 p.m. This deposition is being taken via Zoom videoconference. Will counsel please identify themselves and for whom they represent starting with Plaintiff. 13:04:21

MR. WALLACE: David Wallace on behalf of the Plaintiffs. 13:04:36

MR. PORTER: Mike Porter for the City of Portland on behalf of the Defendant. And Amanda Armenta just joined as my paralegal; so she'll just be in the room but not actively participating. 13:04:46

VIDEOGRAPHER: Thank you. And my name is Gretchen Magarro, your videographer; your court reporter is Traci Moore, with LNS Court Reporting, and the CSR will now swear or affirm the witness. 13:04:56

JESUS VELEZ PASTRANA

having been first duly sworn by Robin L. Nodland, Oregon Certified Court Reporter No. 90-0056, was examined and testified as follows:

EXAMINATION 13:04:56

BY MR. PORTER:

Q. All right. We had a little back and forth there, and I believe you put your name on the record already. Would you just do it one more time, your full name? 13:05:19

A. My name is Jesus Velez Pastrana.

Q. Thank you, sir. My name is Mike Porter. I'm with the City of Portland. I'm representing the defendants in this case -- well, the City of Portland defendant in this case. 13:05:36

A. All right.

Q. Let me get my notes organized here a little bit so I can see you and my notes. There we go.

A. Yes. 13:05:44

Q. Have you ever been deposed before Mr. Pastrana?

A. Disposed, like, what does that mean?

Q. Deposed, like what we're doing today?

A. No. 13:05:58

Q. Let me give you a few instruction that might help us as we go forward. So everything we say today is being recorded, both by the court reporter who's typing it down and also by the videographer, the person videoing this. 13:06:16

If you -- so although we have a video, if I ask you a question, it's important that you answer out loud so that the reporter can type it down.

A. Okay. 13:06:29

Q. Nods like that, gestures, things like that, those won't be picked up by the court reporter. Do you understand?

A. Okay.

Q. If you don't understand one of my questions, like the one I just asked, please ask me to clarify, to explain. If you answer my question, I will assume you understood what I was asking. So it's important that you feel comfortable that you understand my question. 13:06:38 13:06:57

A. Okay.

Q. It's important that we wait. I ask a question, you wait for me to finish before you answer; and then I wait before you answer to ask the next question. We're doing great so far. We 13:07:10

want to keep that up. Okay?
A. No problem.
Q. Now your attorney may have objections to a question I ask. If he objects, I'll let him make the record, maybe explain why he objects, and then if he does not tell you otherwise, just go ahead and answer the question. 13:07:24
A. All right.
Q. Now this is a virtual deposition. That means we're on camera. I lost you a little bit there. 13:07:39
A. I pressed it up.
Q. There you go. So I know John's in the room. Is there anyone else there with you today?
A. No, nobody is here, just me and him. 13:07:49 But, for the record, the reason that John is with me is because I need to be very close to him for anything.
You know, like, breathing, swallowing, whatever. Even coughing, I need to be careful. So 13:08:05 that's why I had to put him over here (indicating).
So I hope you don't mind. I can put him back in the other room, but he's going to be there by himself, right?
Q. Okay. 13:08:16

A. You know, and the TV is on, but the volume is way down. So he's just watching TV, you know, looking, whatever is happening over there. So that's that.
Q. Thank you for that explanation. 13:08:30
A. All right.
Q. I don't have any problem with that. Do you have any documents with you right now?
A. No, I don't have any documents.
Q. Okay. Are you on any medications right now that would make it hard for you to testify today? 13:08:41
A. No, not at all.
Q. Do you have any questions before we get started? 13:08:53
A. No.
Q. So to begin, I want to acknowledge that I understand that you and Mr. Irwin suffered very serious injuries in this accident. My questions today are not meant to minimize the harm. It's simply to make sure I understand your knowledge of these events as completely as possible. Okay? 13:09:09
A. Okay.
Q. So what is your date of birth?
A. January 21, 1967. 13:09:24

Q. And what -- are you married?
A. Yes, with John G. Irwin, Jr.
Q. Where were you married?
A. We were married in Carrboro, North Carolina. 13:09:38
Q. Were you married prior to April 29th, 2022?
A. Yes.
Q. Do you live with anyone besides John right now? 13:09:52
A. No.
Q. Are you currently employed?
A. No.
Q. I understand that you care for John. That's a full-time occupation; is that right? 13:10:04
A. That's right. That's why I give up my job for the government. I used to work for the Department of Community Justice, and I had to resign to take care of John.
Q. So what was your job with the Department 13:10:20 of Community Justice?
A. I was working for the Pretrial Release Program. The Pretrial Release Program is a program that is intending to help people that's been arrested. And then the judge, instead of keeping 13:10:38

those people in jail, they -- they put them on Pretrial Release Program.

And this is almost like probation. What we do, we call the defendants and we're trying to make sure that they are going -- they are doing great while they are out of jail. 13:10:54

Q. Was that for Multnomah County?

A. That's correct.

Q. And is that the last job that you had before taking care of John? 13:11:05

A. Yes. And I was hoping to retire from there.

Q. Does that job currently have any special education?

A. Yes, you need to get -- you -- well, first, you need to have college to get into that position. You need to have education to -- to -- I mean, to know what you are doing, because you're going to deal with legal documents, signed by the judge, by the district attorneys. 13:11:22 13:11:37

So I did that. I got my education from Mexico. Also, what is it? We -- and, also, the county provides you or helps you or guides you to -- to do your job better by -- what is it? -- going to these certain kind of programs through the 13:12:01

County and helping you out to develop better work and everything. To have quality, yeah.
Q. How long were you with the County?
A. Oh, shoot. Probably four, five years. Four, four years. 13:12:14
Q. And what did you do for work before working for the County?
A. Before I was working -- let's see. Before I worked for the County we used to live in Raleigh, North Carolina. And right there I used to 13:12:30 be an interpreter. Interpreter.
Q. I think we all missed have a little bit of that. I know I did. Could you say what you did in Raleigh one more time? You cut out.
A. I used to be interpreter. 13:12:49
Q. All right. Thank you.
A. But no certify, no certify. I was just helping the Hispanic community, and that's what I did.
Q. How long did you do that job? 13:13:01
A. I did it since 2000- -- probably 2012, 2012.
Q. Okay. Have you ever been in a lawsuit before?
A. No. 13:13:17

Q. What, if any, documents did you review to prepare for today?

A. None. Because what I'm going to tell -- when you -- when we get to the point where you're going to ask me what really happened, I don't need to read anything. 13:13:35

Because I know, I was sworn already. I'm going to tell the truth, and this is what happened. So I'm not reading any papers. I am just going to tell you what happened, and I certainly remember very, very well. 13:13:48

Q. Thank you. I appreciate that.

A. Thanks.

Q. Did you speak with anyone besides your attorney to prepare for today? 13:13:59

A. No. No, I don't talk to anybody. We don't have friends anymore. Everybody just walk away from us. And no friends, no family since John had the accident.

All my friends, they blew us off, so they don't even call me to see how we are doing. My family, his family never came over to help us. So I just give up. I said, you know what? It's just me, yeah, and him. 13:14:15

Q. I'm sorry about that. 13:14:28

A. Oh, that's okay. That's -- I'm so sorry to interrupt you, but that's a sign. Friends are supposed to be friends, the true friends, are the ones that stick with you on good and bad.

That means we probably had a bunch of fake friends, you know, even though we knew many of them for over 20 years. 13:14:44

Q. Okay. Well, you mentioned the event and you remember it well, so let's just start talking about that and I'll just ask questions and make sure I understand. 13:15:02

A. All right.

Q. What do you remember about the day just before the crash, so maybe the last hour before the crash, just tell me what you remember. 13:15:16

A. The last hour before the crash would be probably around -- after -- a little bit after 4 p.m. Well, I was right. I was very happy, because we were -- we already got tickets to see a movie. We were going to see a movie named "Memory," with Liam Neeson. John got the tickets early that day. 13:15:35

So I was waiting for 5 p.m. to log off on the computer, because I was working from home. So I log off at 5 p.m. very excited, because I just 13:15:52

got paid from the County that day.

So I went upstairs at exactly 5 p.m. John was watching TV, and then he said, "Are you ready to go?" I said, "Yeah. Let's go and see the movie." He said, "Well, I got tickets for 8 p.m." 13:16:09 He said that.

I said, "Oh, all right." He said, but let's go to the pizza place named Baby Doll Pizza, which is located on the corner of 29th and Stark Avenue. So he -- he used -- John used to love that 13:16:29 kind of pizza so much. And I said, "Okay. Let's go and get the pizza, and then we can walk to the bus and then we can go to the movies."

So we -- what is that? We -- like, after just talking with him, just on -- on those minutes, 13:16:48 talking to him about the movie, the pizza and everything, he said, "Okay. Let's go." And I said, "Okay."

So we locked the door, we walked out of the house. Then John and I, we are stopped on the 13:17:01 corner of our house, on the corner of 20 and Pine. So we stop on the corner, because he look around on the house, he turned around, and he said, "So what do you think? We can put plants here, we can put plants there." 13:17:16

He was telling me about the deck. We -- we -- we had a construction company that were building that deck outside the house. They just started, but the construction workers were not there. John was looking and saying, "Oh, we can put a plant here, we can put a plant there." 13:17:28

Then, okay. Let's go to the movies, let's go to the pizza. So we started walking Pine Street to the east. So we were on 20 and Pine, and then we crossed 21 -- 21st, 22nd. 13:17:49

And every time that we got into any intersection, we always looked both ways all the time. Just we make sure that, you know -- I mean, be careful with the people. Especially Portland, they're well known for bad drivers and everything. 13:18:10 They didn't stop. I was, okay. We learned all of that.

We were just looking. When we got to the intersection of 26th Avenue and Pine, I remember we -- what is it? They got the stop signs on 26th 13:18:28 on the north, 26th on the south.

So when we were crossing 26th and Pine, we looked first, and then we started walking. We probably did, like, four -- three, four steps, something like that, when a big noise. I mean, a 13:18:54

big, huge noise on our right side.

So, like, squeaking tires and things just out of control. I don't know how to describe the noise, but it was this kind of noise, nasty noise. So we just look. I mean, so we just look. 13:19:11

And John, John said, "Run." I saw a big, white, box truck coming toward us. And I just heard John said, "Run," and that was it.

I, like, seconds later, I would say seconds later, I saw myself getting -- trying to 13:19:38 get up off the ground. And I was, like, "What happened?" I mean, I don't even know what happened.

And I was, like, "Oh, my God." I thought I was dreaming, because one second I was talking to 13:19:50 John, and then I saw the big, white, box truck, and then on the next second I was on the ground trying to get up.

And then I can hear people screaming. I don't know what they were saying. I just heard 13:20:08 people screaming. I said, "What happened?" I thought I was dreaming.

And then a guy was just coming to -- toward me, and he said, "Hey, are you okay?" But then I realized that he was a police officer, and I 13:20:24

say, "Yeah, I'm okay. Are you okay?" I ask him back if he was okay.

He said, "You need to go to the emergency room." And I said, "No, I don't need to go to the emergency room." He said, "Yes. You've got a broken jaw." That's what he said. 13:20:40

Suddenly, I grab my -- I mean, with my hands I was touching my jaw, and my jaw was broken all the way down and blood everywhere. Then I looked down on my pants, and my pants were soaking wet from blood. 13:20:53

And I looked down, and the police officer, the one that walked toward me and asked me if I was okay, he said, "Oh, don't worry. That blood is not yours. It's from the person that was walking with you." That's what he said. 13:21:09

And I was, like -- in that moment I was, like, Oh, shoot. John. I say, "Where is John?" I asked him. He said, "Oh, he already was taken to the emergency room." 13:21:21

And then I asked, "And how is he doing?" And the police officer said, "Oh, I'm so sorry. I don't think that he's going to make it." That's what he said, and I swear to God he say that.

In that moment, I knew it was not a 13:21:36

dream. You know, I knew something bad happened to us, but I couldn't explain what was it.

And that's how it happened, and I was taken to the emergency room after that.

Q. Thank you. I just want to check my notes. So backing up a little. I want to make sure I cover all of the things and make sure I understand. You lived near the corner of 20th and Pine? 13:21:57

A. Uh-huh. 13:22:11

Q. You were heading to Doll's Pizza on 29th and Stark?

A. Uh-huh, yes.

Q. Okay. And you and John -- John liked Doll's Pizza, Baby Doll Pizza, correct? 13:22:25

A. That's correct.

Q. Did you make that walk often?

A. Yes. We -- John and I, we used to be so close, and we used to do a lot of things all the time. I mean, we used to go to the movies -- to the movies probably four to five times a week. 13:22:40

And we used to walk everywhere all the time. We used to walk -- and also to that pizza place, we used to go and get a beer one day -- sometimes and a slice of pizza and talk. Yeah, we 13:22:59

were there many times.
Q. Did you usually take the same route, go the same way?
A. No. We -- we -- to walk to that place, we can either go Pine. Sometimes we used to go to Ash Avenue. It was Ash Avenue and then on 24, and then we used to turn right to get into Stark. 13:23:13
And then sometimes we used to get to Stark, or sometimes we used to go up to -- three blocks up to Burnside and go just Burnside all the way to 28th, the last road that you take all the way down into Stark to get into the pizza place. 13:23:31
Q. Do you remember what movie theater you were headed to that night?
A. Yes. We were heading to the movie called the Fox -- the Regal Fox Theater, which is on -- I believe it's on Sixth and -- oh, my God. It's Sixth -- well, it's one block from Broadway by the little (unintelligible), yeah. 13:23:45
Q. All right. Do you remember seeing anyone else at the intersection where you were hit just before the -- 13:24:05
A. No.
Q. No?
A. No, I don't remember seeing anybody. I 13:24:13

mean, I was just talking to John. We were talking. We were excited, because we were -- what you say? With his plans. He was very excited about his plans. I was, Oh, okay.

Q. The street where you crossed, is there a crosswalk there or is it unmarked? 13:24:30

A. It's unmarked, but it has a stop sign.

Q. Okay.

A. I mean, we seen those stop signs all the time. Because like I told you, sometimes we take the same route to go there or a different route to go to the pizza place. 13:24:45

Q. You said earlier that you always looked for traffic.

A. We always do. 13:24:53

Q. Okay.

A. Yeah, we used to go to the park. You know, the park that's right there near 30 and Stark Avenue. There's a big park over there, close to Cesar Chavez. So we used to go over there and just walk on the same block sometimes. 13:25:09

And, yeah, we always be careful where we're looking around when we where crossing the streets.

Q. Did you do that when you were crossing 13:25:20

26th that day?
A. Yes, we did. We looked. Like I said, we looked both ways. Look, and then we started just walking. You know, our business, doing our talking. 13:25:33
And suddenly, it was a sound just like that. It's, like, the truck just got into the road, but you can't -- I mean, you hear the noise, and that's when we look, and he said "Run."
Q. So you didn't see the truck until after you heard the truck? Do I you know that? 13:25:49
A. That's correct. You heard the noise first. We looked, and then I saw the truck coming toward us. I was, like, oh, my God.
Q. How close was the truck when you turned and saw it? 13:26:04
A. Well, I don't know. What is -- I think I saw it very close. And I'm letting you know. That truck was not driving, it was flying. I mean, it was, like, unbelievable. 13:26:18
It's, like, when we turn, it's, like, you see the truck probably one block away, and then in less than one second it was right here next to you. It was just like that.
Q. And -- 13:26:30

A. Like, at the moment -- I'm so sorry. At the moment that we heard the noise, we looked to see the truck -- I mean, probably a couple meters or something.

And then suddenly John say, "Run," and you can see the truck right here (indicated). That's all. 13:26:45

Q. When you saw the truck for the first time, when you saw it, was it in the intersection or was it still behind the stop sign? 13:27:00

A. Well, I think it run the stop sign, I guess, because we were on the other -- I mean, there are one, two, three, four sidewalks in the intersection. You know, so we were on the northwest of the intersection of those four corners on the sidewalk. 13:27:18

Q. All right. I'm going to pull up a picture here real quick and share it with you.

A. We were crossing, and then we were crossing. Yeah, with put the picture. 13:27:27

Q. I want to make sure that we're all talking about the same thing here. Do you see that? Oh, not yet.

A. Okay. I can see it now.

Q. Okay. Does that look familiar to you? 13:27:44

A. Yes, that looks familiar.
Q. Is this the intersection you're describing?
A. Yeah. Where's the school? Is the school on the left -- on the right side? 13:27:56
Q. Flip around here. Does that look right?
A. Yes, that's where it is. We were not on this side. We were across from the school on the other side.
Q. Okay. 13:28:07
A. Right here on your left side. Yeah, where --
Q. Right here?
A. Yeah, right there. We were there. We look both ways. 13:28:14
Q. Okay.
A. Yeah.
Q. All right. And then you said you were four or five steps into the --
A. Around there, yeah, that's when we hear the noise. 13:28:24
Q. Okay. And that's where you looked and saw the truck?
A. And we look, and John said, "Run." And then I end up on the sidewalk, all the way down on 13:28:34

your right. On your right. Now right there (indicating). I end up on the right.

Q. Okay.

A. I was seeing myself getting up. And I said, "What happened?," so I didn't know. 13:28:47

Q. So you said you were unconscious for a while?

A. I -- no, I didn't say that I was unconscious for a while. I just said that it was a matter of seconds. Because I remember that -- John 13:29:03 said "Run," and suddenly I was feeling myself getting up.

And it was, like, talking -- I mean, listening to him when he said "Run," and getting up. I was, like, "Oh, my God. What happened?" It 13:29:19 was like that, just a matter of seconds.

Q. Do you know how much time actually passed?

A. Nope, nope.

Q. Now I heard you just testify that he said 13:29:33 "Run." Were you able to move at all between when John said "Run" and when --

A. I don't know that. Because he said "Run," and that was it. That's all. It's, like, my mind was gone. Everything was gone. 13:29:46

Q. I see. I need to figure out how to stop sharing. I found the button.
If I heard you correctly, when you realize -- when you -- would you say, like, you woke up in a dream? 13:30:27
A. Yeah.
Q. Right when you woke up, I heard you say that John was already in an ambulance and gone?
A. The police officer say that.
Q. Oh, okay. Tell me more about that. 13:30:39
A. Well, what happened is when I felt myself getting up, I can hear screaming everywhere, but I didn't know what happened. It was just, like, I was dreaming.
So then I remember I was standing, and I saw this person coming toward me and asked me, "Are you okay?" And I said, "I'm okay. Are you okay?" I asked him back, and I realized he was a police officer. 13:30:54
And then he said right away, he said, "You need to go to the emergency room." I said, "No. Why?" And he said, "Because you have a broken jaw." And I say," Okay." 13:31:08
And then when I start touching -- my hand, when I was trying to reach my jaw, and I can 13:31:24

feel my broken jaw all the way down and blood everywhere.

But then when I looked down and I saw my pants that were soaking wet in blood, he said, "Oh, don't worry. That's not yours," He say, "It's from the person that was walking with you." 13:31:39

And I said -- in that moment, that was when I realized, "John. Oh, John. Where is John?" I said that, and he said, "He already was taken to the emergency room." That's what he said. 13:31:52

And then I say, "How is he?" And he said, "Oh, I'm so sorry. I don't think he's going to make it." That's what he said.

Q. Okay. But I just want to -- thank you for clarifying that. You say he told you John had left in an ambulance. Was John still there? 13:32:07

A. I don't know. I was at -- I was, like -- I don't even know. My body was numb. I was in shock, and it was way worse when he told me that John was already taken to -- he was -- oh, it was way worse when he told me that probably John is not going to make it. 13:32:27

That's when -- I mean, and just think about it. You're in shock, because of the accident, and suddenly somebody tells you something 13:32:39

that -- well, the person that you love is -- that's it.

So it's just you get on this kind of shock that you don't know what to do. You don't know. You just let other people move you around, and that's why I let the police -- the paramedics just to put me on the stretcher. I mean, I don't even know. I was not thinking in that moment. 13:32:52

Q. Okay. So when is the next time that you saw John after you saw -- when he said "Run," when's the next time you saw him? 13:33:10

A. Okay. What is that? I don't remember what time the accident happened. I know it happened, I mean, after 5 p.m. Because I log off from work from the basement from my office at 5 p.m., and then by the time that we leave the house, we were walking, and this and that. 13:33:23

I ended up at the emergency room. Then what is -- I just remember when I was in the emergency room, I can feel the doctors and the nurses cutting my shirt with scissors and giving me -- what is -- injections, because I was puking. 13:33:37

One nurse told me that I was puking because of all of the blood I was drinking. You're going to be okay, you're going to be okay, and then 13:33:57

they put this kind of cone around my neck to hold -- what is that? -- to hold my chin.

Well, I mean, I know that it was a broken jaw, when the police officer told me, but I didn't know I was going to have all those things and everything. And suddenly the police officer, the detective -- I believe he was a detective that came over. And he ask me same question as you ask me, "What did I see?" What happened and this and that? 13:34:17

I just told him the same, and then I asked him, "Did you get the bad guys?" I say that. He told me that there were four. That's what he said. He said -- I asked him, "Did you get the bad guys?" 13:34:34

And he say, "No, but we know who they are. We are just" -- "we are not going to arrest them yet," because they believed that one of them has an order for arrest in Arizona and he didn't want them to run away and not to be caught. 13:34:49

That's what he said. And then he said, Are you going to stay in the hospital? The detective asked me that, "Are you going to stay here in the hospital?" And I said, "Yes. Look, I've got a broken jaw." I say that. 13:35:08

In that moment, the doctor came in. The 13:35:23

doctor from the OHSU emergency room came over, and he said, "Oh, no. You're not going to stay here. We don't have nurses, we don't have doctors, we don't have rooms. You're going to go home. I'm going to give you ten oxycodone pills for your 13:35:41
pain."

That's it. That's what he said. And I said, "Okay." And then, "You need to call somebody to pick you up." That's what he said. So I called my supervisor from the Department of Justice, 13:35:52
Ms. Sally Black, and I call her and I explained the problem, and she said, "Oh, I'm going to pick you up."

She said, "You need to tell them that they need to give you a chance to see John, because 13:36:07
you are the husband." I said, "Oh, yeah, I'm going to do that." So I ask, "Can I see John, can I see John?" I was begging.

Finally, they said yes. When I was ready to go, when they were -- told me to leave, they 13:36:22
asked me to sit in a wheelchair, and then they dragged me into a couple of rooms that were -- I mean, I was in the emergency room.

They just -- they dragged me so far, but they didn't push me too far in the wheelchair, and 13:36:36

then it was John in that room. And when I saw him, it was the worst thing ever. I don't even know what happened.

John's got tubes everywhere. He has a big tube on the back, leaking all the blood into a plastic bag. He's got his legs like this (indcating), all twisted like this. This part of his brain, it was the worst part. Just, you can see part of the brain. I was, like, Holy -- I mean, I was in shock.

13:36:52

13:37:08

My -- my supervisor called me and say, "I am outside." She took me to the pharmacy to get the medication that they gave me, and then we-- she -- I didn't want her to walk inside the house. I just told her, "Just drop me off here, Ms. Sally. I'm just going in."

13:37:27

And when I opened the door of the house, it was somber. I mean, quiet. Nobody, no John, just me thinking, What happened, what happened? And the first thing I did, watch the news to find out what happened.

13:37:41

And on the news -- on the news, KGW News, I think it was -- oh, KOIN News, KOIN News. I remember. I still have the article. They were talking, they were -- what do you say?

13:37:55

There were these bad guys that drove the truck and everything. They run us over, and they're being chased by police. That's what we -- I saw on the news.

Q. Okay. So if I understand -- 13:38:07

A. And I'm so sorry. I cannot tell you what time it was when I saw John, because -- because I got home, and I had to sleep sitting like this (indicating), because the -- the effect of the injections that they gave me went away. 13:38:26

And if you have this kind of pain in your jaw, you really want to kill yourself. I swear. And I was taking the oxycodone pills, and they were not easing the pain take. They were not -- what is it? Not take the pain away. 13:38:44

And so what I did, I started smashing the leftover oxycodone and put the powder around my mouth, and that was the only way that I can get rid of the pain for a little while. And I was just like this, sitting on the couch, trying to sleep, 13:39:02 with no moving around. Because One movement I make, pain as hell.

And then the next day, I had to go -- I left around 6:00 in the morning. I didn't sleep, and I drove back to see John. And our -- what is 13:39:20

it -- nightmare, it started.
Q. Well, let's talk about what happened from there in a little bit. I appreciate you sharing all of that. I want to kind of go back in time.
So if I'm understanding correctly, you were talking to John, you heard a loud noise, you saw the truck, John said "Run." That's the last time you saw John until you saw him in the hospital with the tubes in him? 13:39:36
A. Well, when he said "Run," I just look, and I saw the truck, and that was the last time. 13:39:53
Q. Okay. When you turn to see the truck, did you see any other cars entering the intersection?
A. No. I think it was a car -- it was a car that was crossing Pine, the same way that we were walking, the same direction. I think -- I barely saw it, but the truck was the big issue. 13:40:06
Q. Did you see the truck and the car crash?
A. Nothing, nothing. Don't even remember nothing, no. 13:40:27
Q. Did you talk to any of your neighbors after you got home about the crash?
A. No. I was, like -- some of the neighbors -- we hardly knew neighbors over there, 13:40:44

because we moved over to that house back in 2019. And John -- I mean, we -- we- John and I, we used to enjoy ourselves just to go out and have a beer somewhere or go to the movies.

I mean, sometimes we say "Hi" to the neighbors, but we don't know them very well. So when the accident happen and I got back home on the following days, it was just an old neighbor, old neighbor on the same block, on Pine Street. 13:41:04

She just knocked on the door and she just brought me this kind of, like, soup for me to eat because I cannot eat anything, and just to say sorry. 13:41:21

Q. Do you remember who that was?

A. Yes. Her name is -- let's see. I think it was Cathy. 13:41:30

Q. Okay. Did she tell you that she -- did she see what happened?

A. No. No, remember we live on 20 and Pine. The accident happened on 26 and Pine, which is six blocks. 13:41:44

Q. Yes.

A. And this is an old lady that lives there.

Q. Okay.

A. Yeah, by our house. 13:41:50

Q. And you didn't speak to anyone else who might have seen what had happened to you?

A. No, I was -- I went to -- what is that? I mean, like I told you, I used to be, like, an interpreter back in those days. And I said, Oh. let me see. I can call an attorney to see what I can do. 13:42:06

And the attorney -- I didn't know her very well, but I got the phone number and I explained the accident. She said -- 13:42:19

MR. WALLACE: Jesus, I'm going to cut you off here.

THE WITNESS: Okay.

MR. WALLACE: It sounds like you're talking about conversations that you had with an attorney? 13:42:28

THE WITNESS: Uh-huh.

MR. WALLACE: Mr. Porter is not asking you about that. All right?

THE WITNESS: Uh-huh. 13:42:33

MR. WALLACE: Things you say to an attorney is private, so I'm directing you not to talk about that. Okay. Does that make sense?

THE WITNESS: Okay. It does make sense. What shall I say? 13:42:47

MR. WALLACE: Just answer Mr. Porter's questions. He's not -- he doesn't want to know about any conversations with an attorney.

THE WITNESS: Okay. 13:42:56

MR. WALLACE: And you. Okay?

THE WITNESS: Okay. All right.

BY MR. PORTER:

Q. I was asking about if you'd talked to any witnesses, witnesses, like, people that saw the 13:43:05 accident?

A. No. That was easy. Sorry.

Q. It's okay.

A. I'm so sorry. Yeah, I get too much, like -- what is it? Talking stuff. This and that. 13:43:19 Because, oh, my God. This is just a headache. That's fine. Okay.

Q. No. I have no problem you explaining as much you want. I think Mr. Mr. Wallace's point was just don't talk about what you talked about with 13:43:33 lawyers. Everything else is fine.

A. Okay.

Q. So you talked about the loud noise. Before the -- you were hit by the truck, did you hear any other loud sounds or were there noises in 13:43:45

the area?

A. No. I mean, we were just talking, John and I. And the only things I heard was when I was getting up. And the screaming, that's all I heard.

Q. Just screaming. That's all -- 13:43:58

A. Uh-huh.

Q. Did you hear sirens afterwards?

A. I cannot tell you if there were sirens or not. I just heard, you know, these kind of noises. Screaming. I can feel it. Screaming. Like I 13:44:12 said, I was shocked.

Q. Understandable. Can you tell me anything more about the box truck?

A. Well, it was, like, a box truck. I remember I just turned around, and for me at that 13:44:28 moment, it looks like a -- I would say, like, a -- I would say, like, a U-Haul truck or something. A big truck, box truck.

I mean, I'm not very good -- I'm not very good on knowing about the cars or something, but 13:44:47 the box truck is, like, you know, the modern and everything up front where people drive and a big box on the back.

Q. Okay.

A. I call it the box truck. I don't know if 13:45:00

you call it another name, but --

Q. No, whatever you want to call it is fine. Whatever description you have, whatever information you have, that will be helpful.

A. Yeah, it was a box truck. Like I say, it was, you know, yeah. 13:45:13

Q. Okay. I just want to make sure I cover everything as we go. So did you see the truck again after the collision? After it hit you, did you see it again before you left to the hospitals? 13:45:48

A. No. I was shocked. I mean, they -- like I told you, I just let the paramedics just -- I mean, after I heard that John -- what is that? That the police officer said -- what is that? I'm not sure he's going to survive or something, and I was, like -- I think I was in shock. 13:46:05

I didn't see anything, nothing. I just let the paramedics put me on the stretcher or whatever they had.

Q. Okay. You said you talked to a police officer on scene and he talked to you. You explained that. 13:46:22

Did you talk to anybody else, did anyone else interact with you before you got in the ambulance? 13:46:32

A. No. No, I didn't talk to anybody, just the detective that walked into in the emergency room while I was there that were giving me John's personal stuff and everything and that were asking me questions, just like that. 13:46:45

Q. But not when you were still at the intersection?

A. No. Just the officer that came over and told me that John is not going to make it.

Q. Okay. All right. So just a second. I 13:47:03 have a couple screens here. I want to focus here. Did you -- could you see anybody in the cab of the truck as it came near you?

A. No, I didn't. No, just, like, the image of the truck and that's it. Then seconds. Like, 13:47:30 one, two, three seconds. "Boom." That's it.

Q. The car that you saw just before you were hit, did you see it afterwards?

A. No. I mean, I didn't see anything after I get up and after listening to the police officer, 13:47:46 it was, like, blank all around. I mean, nothing, nothing. It's, like, just what the police said. I was in shock.

Q. Okay. So I want to talk a little about the emotional impact this had on you. 13:48:07

A. All right.

Q. You started to talk about that, about the nightmares starting.

A. All right.

Q. So I'm reading through a declaration that you signed recently and it talks about -- I'm wanting you to talk to me about persisting anxiety that you're feeling. 13:48:15

A. Oh, my God. This is the worse thing ever. Like I said, John and I are -- now we are 26 years living together. I mean, we've known each other for over 26. 13:48:34

And John and I always used to love each other, respect each other. Oh, my God. We used to do everything together all the time. Now the emotional impact is terrible, because he was -- I mean, my husband. He was the person I love, and I knew that he loved me so much. 13:48:49

Unfortunately, I am not his husband anymore. I am his slave, because I'm his caregiver 24/7. I have to change his diapers all the time and I have to dress him up all the time and give him a shower, cut his nails, the toenails, the hair. I mean, shaving and everything. 13:49:09

So cooking for him, doing dishes, taking 13:49:28

care of his medication. It's just too much. We don't have anybody to help us.

His family never came over to see him, after three years and four months since the accident happened. I beg them, I beg them. Come on. Please help me out. I would like to take some days off, you know. Nope. So my family, the same. 13:49:42

So it's really, really it's just stressful. I have -- and the insurance company is not paying for diapers, it's not paying for cleaning wipes, it's not paying for everything; so I had to use -- John -- right now we are surviving on John's retirement check and Social Security check. 13:49:58

And from that, we have to pay for the SUV that we got for him with the ramp to get him to his appointments and everything. So plus, we are paying, like, almost $4,000 for 40 classes at a hospital for his rehab. That's one, 4,000. 13:50:13

And then we are paying 7- to $9,000 to the brain therapy, another company, brain therapy for three months that the Medicare doesn't cover. But I just want him to come back. That's why I'm doing this. I mean, we are spending everything. 13:50:32

Then house of our dreams, the one that we 13:50:51

used to have in Portland, we loved that house so much. And what happened? So I had to sell it very cheap, very cheap.

And we had to move here, to Denver, which I don't like Denver. I like Portland, but we had to live here because he needs to get his therapies here. This is the only place where he -- hopefully, he can get better. 13:51:04

It's been three years and four months when I end up in the emergency room, and I haven't seen a doctor. I haven't seen a doctor. I know my blood pressure is way high, whatever. 13:51:17

I try, I try to calm down. I calm down and just keep going. I know that one day it's going to get better. There's always hope, and that is what I'm believing. Just hope to get him better, to get him back. 13:51:31

Q. You mentioned the nightmares in your declaration. Can you tell me more about that?

A. Oh, yeah. Oh, my God. You have to see. Sometimes in my nightmares, I see -- what is that? Sometimes I heard somebody knocking at the door. And when I open the door, it's John. 13:51:44

It's John just, Hey, what -- and talking to me the same way he used to talk. When I wake 13:52:02

up, it's just, like -- I mean, it's depressing because, you know, you have to go back to reality.
And I say, Oh, my God. What happened? These are my nightmares. And not just that. The big nightmare is the big, nasty truck that come over us, and in my nightmares I can see John walking with me and boom. 13:52:20
So this is just terrible. And -- and believe me, I don't have any counselors. I don't have anybody to help me out to tell me, You're going to be okay. Nobody, nobody is helping me. 13:52:39
I try to be very strong by myself and think, Well, there's no help. Nobody is going to do it. I can do it. I can take care of this.
So even with my nasty nightmares, dealing with John the way that he is right now and taking care of all of the stuff that we need to take care of, so I just try to calm down and say everything is going to be okay. He's going to be okay one day. That's what I -- there's hope, always hope. 13:52:55 13:53:14
Q. Thanks for sharing that. So I just want to make sure I understood to you. Since you left OHSU, you haven't seen a doctor for your injuries?
A. No.
Q. Did -- 13:53:25

A. I'm so sorry. What is that? When I got discharged, I went -- I got discharged on Friday. I'm not sure what time. I don't know, but then Wednesday -- no, Monday -- let's see. One, two, three, four. 13:53:41

Oh, Monday, they call me, an office where there's a doctor that deal with the jaw, broken jaw or something. They called. I think they're part of the OHSU by the waterfront, and they called me and they gave me an appointment for 3 p.m. for 13:53:57 Wednesday.

So the accident happened Friday. Saturday, Sunday, Monday, Tuesday, Wednesday, so for five days I was dealing with a broken jaw, which it was hell, hell, hell, hell. Five days 13:54:11 later, that's when I went to see -- I left John on his own.

I just went to OHSU, like always every morning, very morning. I said, "I'll be right back." That day, I remember they fix my jaw. And 13:54:29 I just left home, and that was it. So that was the last time -- oh, and then the doctor said, "You need to come back next month, just to see how you are doing, you know."

And, yes, I went back, just to see how I 13:54:45

was doing, but the doctor was leaving. He was moving to North Carolina. He said, Well, you need to wait, because I couldn't -- I couldn't chew food.

He said, "Well, you need to wait one more week or two more weeks." I said, Okay. But that was it, that was the last time. And I did not go back. Why? No time. 24/7 with this guy. I was trying to -- trying to make him so that he's coming back. 13:54:58 13:55:12

Q. Okay. Have you talked to anyone about the nightmares or the anxiety that you suffer?

A. I mean, who? I don't have friends anymore. They never call me to see how John is doing, how you're doing. Nobody. 13:55:29

So sometimes I found myself talking to myself or talking to John, but talking to John is like talking to the wall. He's not there. And me, like, Oh, my God. And I just talk to myself and I say, Oh, my God. I hope I don't get nutty or out of control. 13:55:49

You know, I try to calm down, but no, I don't talk about my nightmares. I don't talk to anybody, not even my family.

Q. No doctors or anybody beyond -- 13:56:00

A. One day I started talking to some nurses, but you can see them kind of not interested or something. You can feel it. You can feel when you start a conversation and say, Oh, guess what, this and that. Okay, and they just blow you away. Why am I telling this person this? I just start to be quiet now. 13:56:17

Q. How many times did you try to talk to the nurse?

A. Well, a couple of -- well, I see nurses all the time, but a couple times. I don't know how many, but a few. Two, three maybe. 13:56:27

Q. Beside the OxyContin you got that first day, did you get any other medication?

A. That was the only thing, Oxyconton, and I ran out of the OxyContin on Saturday. And, of course, I shouldn't be driving the next day, you know, after the accident with the OxyContin pills. 13:56:47

I shouldn't be driving, but for some reason, I got very strong just trying to see John and how he's doing, yeah. 13:57:03

Q. How long --

A. How long what?

Q. How long was John at the hospital?

A. At OHSU. Well, I believe -- May, June, 13:57:17

July. I think it was July they transfer him to a place called Vibra. This is a hospital for -- they specialize in traumatic brain injury, and then they took him back again.

So he was out of OHSU probably for May -- I mean, April, May, June, July, for three months, and then to Vibra for one week and then go back to OHSU, and then Vibra again, and then go back. 13:57:38

And then from July, he was -- they were taking John to the emergency room, emergency room, because John was with a trach over here (indicating) with ventilators, so he cannot breathe, and a feeding tube. And, you know, yeah. 13:57:54

Q. You said that you make John's meals now, so no more breathing tube, no more feeding tube? 13:58:19

A. Yes. I -- I -- I -- what is it? Like, when I left my work, my job, I said, you know what? I need to get this guy better.

You know, we were having a headache trying to get him therapies at OHSU, because the therapists are very busy over there, And we used to see the physical therapy once every two weeks. 13:58:37

And then the insurance company was, Well, we cannot do it. Too many insurance companies. So I said, you know what? I told my supervisor, "I'm 13:58:54

not going to work here anymore. I'm going to take care of John."

I started taking care of John. I am his caregiver. I can cook very good for him. Healthy food. So John was not able to eat because of the feeding tube. 13:59:11

He also -- his sodium levels were -- used to be very low, and he has to use 350 milliliters of saline water into feeding tube every three hours, every three hours. So I was putting the saline water into his feeding tube every three hours. 13:59:30

We went to see a neurologist at the hospital in downtown by the Pearl District. I think it's called the -- what is that? It's not OHSU. It's another -- I can't remember that hospital, but it's in downtown. It's in Pearl District. 13:59:42

So he has -- the trach over here, where he used to have a ventilator. And then the doctor, the neurologist, he said, "You know what? You are struggling too much with John." What John needs to get rid of the feeding tube is to just start feeding him. 14:00:01

He said, "You have two options, he either 14:00:16

gets better or he either ends up in the emergency room again." And I said, yeah.

So when I started feeding John, I used to drive to the emergency room and park outside, and then I would start giving him a little bit of food, 14:00:32 a little bit, so he can start chewing. That's how I got rid of his feeding tube. Then after that, when the doctor pulled the feeding tube, he said, "Good job." He said that.

The problem was John started waking up a 14:00:49 little bit more. And when I was driving, finally he was -- he was, you know, in his wheelchair next to me. Finally, he used to say, "What's this?"

Oh, he's got his feeding tube in his hand. He used to pull his feeding tubes all the 14:01:05 time. It was, Oh my, God. So I was dealing with him waking up a little more aggressive, but I don't know. That's a traumatic brain injury.

So I had to put gloves on him while I was driving so he would not touch anything over there. 14:01:19 So I was trying to be very safe with him, and then now, now we are getting a little better; no feeding tube, no trach, no ventilators.

We're just hoping that he can start moving. Unfortunately, he --unfortunately, I'm 14:01:34

still struggling, because John cannot move.

And when I put him in bed, I have to move him every two hours. You know, rotation back and forth, back and forth every two hours, because he might develop bedsores. 14:01:55

You know, so I have to do that. On his chair, I had to pull him up and down, up and down every 40 minutes. That's what I was told.

And so you will not see me sleeping any hours anymore. Every time I put him on bed, I have 14:02:12 to put a clock on. When it's two hours, take a nap, and then go over there and move him.

And then set the clock again for two hours, and then go and move him. It's like that every day, every night. 14:02:28

Q. Okay. Well, thanks for sharing that with me. I want to go back and check on a couple of things. That mostly answers my questions already and I appreciate that.

Do you know anything about -- do you 14:02:40 personally know anything about what the police did before you saw the white car -- that white truck in the intersection?

A. No, I don't know anything about the police. 14:02:49

Q. Do you have any thoughts about what could have been done differently that day so that you wouldn't be in the situation you're in?

A. Yes. Like I said, I was working for the Pretrial Release Program, you know, the Pretrial Release Program for the Department of Justice. 14:03:06

Later on, later, months later and everything, I find out that the person, the perpetrator or the one that was leading the group of the bad guys, Joseph whatever. His name is Joseph Gary whatever. 14:03:25

He -- he got in too many run-ins with the police over there. And we release him on pretrial release many, many times, and he never comply, never. So I think if we work a little bit more on keeping bad guys off the streets, this accident would not happen. This accident would not happen. 14:03:42

And I -- the problem is that we wait until somebody gets hurt or dies to punish these people. That's the problem. So things like that could have been done a long time ago, but it seems like sometimes nobody is in charge, I know. 14:04:02

Q. Anything else?

A. No. And I'm not angry. Okay? I'm just talking to you, telling you. Because I try to calm 14:04:19

down, not to get to the point to start drinking, because I never do, but I always try to be positive.
Q. I appreciate that.
A. And try to learn how to be resilient. Resilience, that's what I learn. Actually, I learn that word first, and then I learn how to be resilient. 14:04:30
Q. I appreciate that.
A. It has to do with all of this mess. 14:04:43
Q. Is there anything you think I should know about that day that you haven't told me about?
A. Let's see. About that day. Yes, just this. It was the -- one of the happiest times. Before that, before the accident, it was one of the happiest talks that we had in our lives, John and I. 14:05:02
We got a deck that was building up on the house. John got his second COVID shot, the COVID shot. 14:05:22
Q. Uh-huh.
A. Which he was feeling kind of more secure. And the most important thing, two or three weeks before, I became an American citizen.
Q. Great. 14:05:37

A. And we were just happy as hell, trying to think that maybe one day we can go to Canada. But guess what? It's gone.

All of our dreams, all of our goals, they are gone. Now my hope is getting this guy back a little bit and hopefully things can start getting better. 14:05:51

Q. Okay. Thank you, Mr. Pastrana. I'm going to pause right now for a few minutes and check my notes. So I'm going to go off camera, and we can go off the record. 14:06:06

VIDEOGRAPHER: We are going off the record at 2:06 p.m.

(Interruption in proceedings.)

VIDEOGRAPHER: We are back on the record. It's 2:09 p.m. 14:09:29

BY MR. PORTER:

Q. Mr. Pastrana.

A. Yes.

Q. Mr. Pastrana, thank you for your time and candor in answering my questions. I don't have anything else for you right now. 14:09:44

I'm going to tell you, and we'll talk about this in a just minute, but we're going to hold this open, this deposition open to talk more 14:09:58

about the medical side of this at another time.

Mr. Wallace may have questions for you, but I thank you so much.

A. Thank you so much.

EXAMINATION 14:10:08

BY MR. WALLACE:

Q. Guys, can you hear me?

A. Yes.

Q. All right. I just have a few questions, Jesus, if you'll try to answer them. 14:10:43

I want to bring us back to the day of the accident and really right when it was happening. Do you remember what side John was walking with you on? Was he on your right side or left side?

A. He was on my left side. 14:11:01

Q. He was on your left side?

A. Yes, and --

Q. And --

A. Let me just interrupt you on why he was on the right side. Because he always said, Oh, you 14:11:13 need to walk on my right side. He always say that, Always. I don't know why. That was his kind of behavior that he used to have.

Q. Right. So when the collision, like, right when it occurred, do you recall whether or 14:11:31

not you were hit first or John was hit first?

A. No. It was seconds. "Run," and that's it. I don't know. Nothing.

Q. Okay. So John yelled "Run," and then a few -- you looked up and saw the vehicle? 14:11:51

A. Yes. Well, we started crossing. We heard the noise. We heard the noise on 26 South. So we just heard the noise, and we look, and I saw the big white box truck. John say "Run," and that's it. 14:12:10

Q. Okay. And you don't recall if you saw John after you got up at the actual scene of the incident? You don't remember seeing him on the ground or anything?

A. No, I don't remember that. 14:12:27

MR. WALLACE: Okay. I don't have any further questions for you. Like Mike said, we're going to keep this open. So, I mean, your story is not done, but thank you very much, Jesus. I really appreciate you taking the time out of your day, you know, and taking time away from John. 14:12:39

THE WITNESS: Do I need to log off now?

MR. WALLACE: Yes, you can log off. I think that we're done for the day. 14:12:49

Is that everything, Mike? Do you have anything from me?

MR. PORTER: Nothing for you. I need to talk to the court reporter, but we can go off the record. 14:13:00

VIDEOGRAPHER: This marks the end of the first deposition. We're going off the record at 2:12 p.m.

(PROCEEDINGS ADJOURNED 2:12 P.M.)

CERTIFICATE

I, Traci R. Moore, a Professional Court Reporter and Notary Public, hereby certify that the deposition of Jesus Valez Pastrana was taken via videoconference at the time and place mentioned in the caption herein; that the witness was sworn by Robin L. Nodland, CSR No. 90-0056, and examined upon oral interrogatories propounded by counsel; that said examination, together with the testimony of said witness, was taken down by me in stenotype and transcribed through computer-aided transcription; and that the foregoing transcript constitutes a full, true and accurate record of said examination of and testimony given by said witness, and of all other oral proceedings had during the taking of said deposition, and of the whole thereof.

I further certify that review of the transcript was not requested.

Witness my hand at Portland, Oregon, this 26th day of August, 2025.

Traci R. Moore

Traci R. Moore
Professional Court Reporter

**$**

**$4,000** 40:18
**$9,000** 40:20

**-**

**--unfortunately** 48:25

**1**

**1967** 8:25
**1:04** 4:10

**2**

**20** 13:7 14:21 15:9 33:19
**2000-** 11:21
**2012** 11:21,22
**2019** 33:1
**2022** 9:7
**2025** 4:2,9
**20th** 18:8
**21** 8:25 15:10
**21st** 15:10
**22** 4:2
**22nd** 4:9 15:10
**24** 19:6
**24/7** 39:21 44:8
**26** 33:20 39:10, 12 54:7
**26th** 15:19,20, 21,22 21:1
**28th** 19:11
**29th** 9:6 14:9 18:11
**2:06** 52:13
**2:09** 52:16
**2:12** 55:8,9

**3**

**3** 43:10
**30** 20:18
**350** 47:8
**3:24-cv-00587-ab** 4:8

**4**

**4** 13:18
**4,000** 40:19
**40** 40:18 49:8

**5**

**5** 13:23,25 14:2 27:14,16

**6**

**6:00** 31:24

**7**

**7-** 40:20

**8**

**8** 14:5

**9**

**90-0056** 5:4

**A**

**accident** 8:19 12:19 26:25 27:13 33:7,20 34:10 35:11 40:5 43:12 45:18 50:16,17 51:15 53:12
**acknowledge** 8:17
**actively** 4:19
**actual** 54:12
**ADJOURNED** 55:9
**affirm** 4:24
**aggressive** 48:17
**ahead** 7:6
**Amanda** 4:18
**ambulance** 25:8 26:16 37:25
**American** 51:24
**angry** 50:24
**answering** 52:21
**answers** 49:18
**anxiety** 39:7 44:12
**anymore** 12:17 39:20 44:14 47:1 49:10
**appointment** 43:10
**appointments** 40:17
**April** 9:6 46:6
**area** 36:1
**Arizona** 28:18
**Armenta** 4:18
**arrest** 28:16,18
**arrested** 9:25
**article** 30:24
**Ash** 19:6
**assume** 6:18
**attorney** 7:3 12:15 34:6,8, 16,22 35:4
**attorneys** 10:20
**August** 4:2,9
**Avenue** 14:10 15:19 19:6 20:19

**B**

**Baby** 14:8 18:15
**back** 5:7 7:23 17:2 25:18 30:5 31:25 32:4 33:1,7 34:5 36:23 40:23 41:17 42:2 43:20,23,25 44:8,10 46:4,7, 8 49:3,4,17 52:5,15 53:11
**backing** 18:6
**bad** 13:4 15:15 18:1 28:11,13 31:1 50:10,16
**bag** 30:6
**barely** 32:17
**basement** 27:15
**bed** 49:2,10
**bedsores** 49:5
**beer** 18:24 33:3
**beg** 40:5
**begging** 29:18
**begin** 8:17
**behalf** 4:15,17
**behavior** 53:23
**believed** 28:17
**believing** 41:16
**big** 15:25 16:1, 6,16 20:19 30:5 32:18 36:18,22 42:5 54:9
**birth** 8:24
**bit** 5:18 7:10 11:12 13:17 32:3 48:5,6,11 50:15 52:6
**Black** 29:11
**blank** 38:21
**blew** 12:20
**block** 19:18 20:21 21:22 33:9
**blocks** 19:10 33:21
**blood** 17:9,11, 15 26:1,4 27:24 30:5 41:12
**blow** 45:5
**body** 26:18
**boom** 38:16 42:7
**box** 16:7,16 36:13,14,18,21, 23,25 37:5 54:9
**brain** 30:8,9 40:21 46:3 48:18
**breathe** 46:13
**breathing** 7:19 46:15
**bring** 53:11
**Broadway** 19:18
**broken** 17:6,8 25:23 26:1 28:3,24 43:7,14
**brought** 33:11
**building** 15:3 51:18
**bunch** 13:5
**Burnside** 19:10
**bus** 14:13
**business** 21:4
**busy** 46:21
**button** 25:2

**C**

**cab** 38:12
**call** 10:4 12:21 29:8,11 34:6 36:25 37:1,2 43:6 44:14
**called** 19:15 29:9 30:11 43:8,9 46:2 47:15
**calm** 41:13 42:18 44:22 50:25
**camera** 7:10 52:10
**Canada** 52:2
**candor** 52:21
**car** 32:15,19 38:17 49:22
**care** 9:14,19 10:10 40:1 42:14,17 47:2,3
**careful** 7:20 15:14 20:22
**caregiver** 39:20 47:4
**Carolina** 9:5 11:10 44:2
**Carrboro** 9:4
**cars** 32:13 36:20
**case** 4:7 5:14, 15
**Cathy** 33:16
**caught** 28:19
**Certified** 5:3
**certify** 11:17
**Cesar** 20:20
**chair** 49:7
**chance** 29:15
**change** 39:21
**charge** 50:22
**chased** 31:3
**Chavez** 20:20
**cheap** 41:3
**check** 18:5 40:13,14 49:17 52:10
**chew** 44:3
**chewing** 48:6
**chin** 28:2
**citizen** 51:24
**City** 4:5,17 5:13,14
**clarify** 6:17
**clarifying** 26:15
**classes** 40:18
**cleaning** 40:11
**clock** 49:11,13
**close** 7:17 18:19 20:19 21:15,18
**college** 10:16
**collision** 37:9 53:24
**comfortable** 6:19
**community** 9:18,21 11:18
**companies** 46:24


JESUS VELEZ PASTRANA, 08/22/2025
www.LNScourtreporting.com

**company** 15:2 40:9,21 46:23
**completely** 8:22
**comply** 50:14
**computer** 13:24
**cone** 28:1
**construction** 15:2,4
**control** 16:3 44:21
**conversation** 45:4
**conversations** 34:15 35:3
**cook** 47:4
**cooking** 39:25
**corner** 14:9,21, 22 18:8
**corners** 22:15
**correct** 10:8 18:15,16 21:12
**correctly** 25:3 32:5
**couch** 31:20
**coughing** 7:20
**counsel** 4:12
**counselors** 42:9
**county** 10:7,23 11:1,3,7,9 14:1
**couple** 22:3 29:22 38:11 45:10,11 49:17
**court** 4:6,23 5:3 6:3,12 55:4
**cover** 18:7 37:7 40:22
**COVID** 51:19
**crash** 13:14,15, 16 32:19,23
**crossed** 15:10 20:5
**crossing** 15:22 20:23,25 22:19, 20 32:16 54:6
**crosswalk** 20:6
**CSR** 4:24
**cut** 11:14 34:12 39:23
**cutting** 27:21

**D**

**date** 4:9 8:24
**David** 4:14
**day** 13:13,22 14:1 18:24 21:1 31:23 41:14 42:20 43:20 45:1,14,17 49:15 50:2 51:12,13 52:2 53:11 54:21,25
**days** 33:8 34:5 40:7 43:14,15
**deal** 10:19 43:7
**dealing** 42:15 43:14 48:16
**deck** 15:1,3 51:18
**declaration** 39:5 41:19
**defendant** 4:17 5:15
**defendants** 5:14 10:4
**Denver** 41:4,5
**Department** 9:18,20 29:10 50:6
**deposed** 5:21, 24
**deposition** 4:4, 10 7:9 52:25 55:7
**depressing** 42:1
**describe** 16:3
**describing** 23:3
**description** 37:3
**detective** 28:7, 22 38:2
**develop** 11:1 49:5
**diapers** 39:21 40:10
**dies** 50:19
**differently** 50:2
**directing** 34:22
**direction** 32:17
**discharged** 43:2
**dishes** 39:25
**Disposed** 5:23
**district** 4:6,7 10:20 47:14,18
**Division** 4:7
**doctor** 28:25 29:1 41:11 42:23 43:7,22 44:1 47:20 48:8
**doctors** 27:20 29:3 44:25
**documents** 8:8,9 10:19 12:1
**Doll** 14:8 18:15
**Doll's** 18:11,15
**door** 14:19 30:17 33:10 41:22,23
**downtown** 47:14,17
**dragged** 29:22, 24
**dream** 18:1 25:5
**dreaming** 16:15,22 25:14
**dreams** 40:25 52:4
**dress** 39:22
**drinking** 27:24 51:1
**drive** 36:22 48:4
**drivers** 15:15
**driving** 21:19 45:17,19 48:11, 20
**drop** 30:15
**drove** 31:1,25
**duly** 5:2

**E**

**earlier** 20:13
**early** 13:22
**easing** 31:14
**east** 15:9
**easy** 35:12
**eat** 33:11,12 47:5
**education** 10:14,17,21
**effect** 31:9
**emergency** 17:3,5,20 18:4 25:21 26:10 27:18,20 29:1, 23 38:2 41:10 46:10 48:1,4
**emotional** 38:25 39:16
**employed** 9:12
**end** 23:25 24:2 41:10 55:6
**ended** 27:18
**ends** 48:1
**enjoy** 33:3
**entering** 32:13
**et al** 4:5
**event** 13:8
**events** 8:22
**EXAMINATION** 5:5 53:5
**examined** 5:4
**excited** 13:25 20:2,3
**explain** 6:17 7:5 18:2
**explained** 29:11 34:10 37:22
**explaining** 35:18
**explanation** 8:5

**F**

**fake** 13:6
**familiar** 22:25 23:1
**family** 12:18,22 40:3,7 44:24
**feeding** 46:13, 15 47:6,9,11, 23,24 48:3,7,8, 14,15,22
**feel** 6:19 26:1 27:20 36:10 45:3
**feeling** 24:11 39:8 51:22
**felt** 25:11
**figure** 25:1
**finally** 29:19 48:11,13
**find** 30:20 50:8
**fine** 35:17,21 37:2
**finish** 6:23
**fix** 43:20
**Flip** 23:6
**flying** 21:19
**focus** 38:11
**food** 44:4 47:5 48:5
**forward** 6:2
**found** 25:2 44:16
**Fox** 19:16
**Friday** 4:2 43:2, 12
**friends** 12:17, 18,20 13:2,3,6 44:13
**front** 36:22
**full** 5:10
**full-time** 9:15

**G**

**Gary** 50:11
**gave** 30:13 31:10 43:10
**gestures** 6:11
**give** 6:1 9:16 12:23 29:5,15 39:22
**giving** 27:21 38:3 48:5
**gloves** 48:19
**goals** 52:4
**God** 16:14 17:24 19:17 21:14 24:15 35:16 39:9,14 41:20 42:3 44:19,20 48:16
**good** 13:4 36:19,20 47:4 48:9
**government** 9:17
**grab** 17:7
**great** 6:25 10:6 51:25
**Gretchen** 4:22
**ground** 16:11, 17 54:14
**group** 50:9
**guess** 22:12 45:4 52:3
**guides** 10:23
**guy** 16:23 44:8 46:18 52:5
**guys** 28:11,14 31:1 50:10,16 53:7

**H**

**hair** 39:24
**hand** 25:25 48:15
**hands** 17:8
**happen** 33:7 50:17
**happened** 12:5,8,10 16:12,13,21 18:1,3 24:5,15 25:11,13 27:13, 14 28:9 30:3, 19,21 32:2


JESUS VELEZ PASTRANA 08/22/2025

www.LNScourtreporting.com

33:18,20 34:2 40:5 41:2 42:3 43:12
**happening** 8:3 53:12
**happiest** 51:14,16
**happy** 13:18 52:1
**hard** 8:11
**harm** 8:20
**headache** 35:16 46:19
**headed** 19:14
**heading** 18:11 19:15
**Healthy** 47:4
**hear** 16:19 21:8 23:20 25:12 35:25 36:7 53:7
**heard** 16:8,20 21:11,12 22:2 24:20 25:3,7 32:6 36:3,4,9 37:13 41:22 54:7,8
**held** 4:6
**hell** 31:22 43:15 52:1
**helpful** 37:4
**helping** 11:1,18 42:11
**helps** 10:23
**Hey** 16:24 41:24
**high** 41:12
**Hispanic** 11:18
**hit** 19:21 35:24 37:9 38:18 54:1
**hold** 28:2 52:25
**Holy** 30:9
**home** 13:24 29:4 31:8 32:23 33:7 43:21
**hope** 7:22 41:15,16 42:20 44:20 52:5
**hoping** 10:11 48:24
**hospital** 28:21, 23 32:8 40:19 45:24 46:2 47:14,17
**hospitals** 37:10
**hour** 13:14,16
**hours** 47:10,12 49:3,4,10,11,14
**house** 14:20, 21,23 15:3 27:17 30:14,17 33:1,25 40:25 41:1 51:19
**huge** 16:1
**hurt** 50:19
**husband** 29:16 39:17,19

I

**identify** 4:12
**image** 38:14
**impact** 38:25 39:16
**important** 6:7, 19,22 51:23
**incident** 54:13
**indcating** 30:7
**indicating** 7:21 24:2 31:9 46:12
**information** 37:3
**injections** 27:22 31:10
**injuries** 8:19 42:23
**injury** 46:3 48:18
**inside** 30:14
**instruction** 6:1
**insurance** 40:9 46:23,24
**intending** 9:24
**interact** 37:24
**interested** 45:2
**interpreter** 11:11,15 34:5
**interrupt** 13:2 53:19
**interruption** 52:14
**intersection** 15:12,19 19:21 22:9,14,15 23:2 32:14 38:7 49:23
**Irwin** 8:18 9:2
**issue** 32:18

J

**jail** 10:1,6
**January** 8:25
**jaw** 17:6,8 25:23,25 26:1 28:4,24 31:12 43:7,14,20
**Jesus** 4:4 5:1, 11 34:11 53:10 54:19
**job** 9:17,20 10:9,13,24 11:20 46:17 48:9
**John** 7:16 9:2, 9,14,19 10:10 12:18 13:21 14:3,10,20 15:5 16:6,8,16 17:18 18:14,18 20:1 22:5 23:24 24:10,22 25:8 26:8,15,16,20, 21 27:10 29:15, 17,18 30:1,18 31:7,25 32:6,7, 8 33:2 36:2 37:13 38:9 39:10,13 40:12 41:23,24 42:6, 16 43:16 44:14, 17 45:20,24 46:10,11 47:2, 3,5,22 48:3,13 49:1 51:16,19 53:13 54:1,4,9, 12,21
**John's** 7:13 30:4 38:3 40:13 46:14
**joined** 4:18
**Joseph** 50:10, 11
**Jr** 9:2
**judge** 9:25 10:20
**July** 46:1,6,9
**June** 45:25 46:6
**Justice** 9:18,21 29:10 50:6

K

**keeping** 9:25 50:16
**KGW** 30:22
**kill** 31:12
**kind** 10:25 14:11 16:4 27:3 28:1 31:11 32:4 33:11 36:9 45:2 51:22 53:22
**knew** 13:6 17:25 18:1 32:25 39:18
**knocked** 33:10
**knocking** 41:22
**knowing** 36:20
**knowledge** 8:21
**KOIN** 30:23

L

**lady** 33:23
**lawsuit** 11:23
**lawyers** 35:21
**leading** 50:9
**leaking** 30:5
**learn** 51:5,6,7
**learned** 15:16
**leave** 27:16 29:20
**leaving** 44:1
**left** 23:5,11 26:16 31:24 37:10 42:22 43:16,21 46:17 53:14,15,16
**leftover** 31:17
**legal** 10:19
**legs** 30:6
**letting** 21:18
**levels** 47:7
**Liam** 13:21
**listening** 24:14 38:20
**live** 9:9 11:9 33:19 41:6
**lived** 18:8
**lives** 33:23 51:16
**living** 39:11
**LNS** 4:23
**located** 14:9
**locked** 14:19
**log** 13:23,25 27:14 54:22,24
**long** 11:3,20 45:22,23,24 50:21
**looked** 15:12, 23 17:10,12 20:13 21:2,3,13 22:2 23:22 26:3 54:5
**lost** 7:10
**lot** 18:19
**loud** 6:8 32:6 35:23,25
**love** 14:10 27:1 39:13,17
**loved** 39:18 41:1
**low** 47:8

M

**Magarro** 4:22
**make** 7:4 8:11, 21 10:5 13:10 15:13 17:23 18:6,7,17 22:21 26:13,22 31:22 34:23,24 37:7 38:9 42:22 44:9 46:14
**marks** 55:6
**married** 9:1,3, 4,6
**matter** 4:4 24:10,16
**meals** 46:14
**means** 7:10 13:5
**meant** 8:20
**medical** 53:1
**Medicare** 40:22
**medication** 30:13 40:1 45:14
**medications** 8:10
**Memory** 13:21
**mentioned** 13:8 41:18
**mess** 51:10
**meters** 22:3
**Mexico** 10:22
**Mike** 4:16 5:12 54:17 55:1
**milliliters** 47:8
**mind** 7:22 24:25
**minimize** 8:20
**minute** 52:24
**minutes** 14:15 49:8 52:9
**missed** 11:12
**modern** 36:21
**moment** 17:17, 25 22:1,2 26:7 27:8 28:25 36:16
**Monday** 43:4,6, 13
**month** 43:23
**months** 40:4, 22 41:9 46:6 50:7
**Moore** 4:23
**morning** 31:24 43:19
**mouth** 31:18
**move** 24:21 27:5 41:4 49:1, 2,12,14

**moved** 33:1
**movement** 31:21
**movie** 13:20 14:5,16 19:13, 15
**movies** 14:13 15:7 18:20,21 33:4
**moving** 31:21 44:2 48:25
**Multnomah** 10:7

**N**

**nails** 39:23
**named** 13:20 14:8
**nap** 49:12
**nasty** 16:4 42:5,15
**neck** 28:1
**Neeson** 13:21
**neighbor** 33:8, 9
**neighbors** 32:22,25 33:6
**neurologist** 47:13,21
**news** 30:20,22, 23 31:4
**night** 19:14 49:15
**nightmare** 32:1 42:5
**nightmares** 39:3 41:18,21 42:4,6,15 44:12,23
**Nodland** 5:3
**Nods** 6:11
**noise** 15:25 16:1,4 21:8,12 22:2 23:21 32:6 35:23 54:7,8
**noises** 35:25 36:9
**north** 9:4 11:10 15:21 44:2
**northwest** 22:15
**notes** 5:17,18 18:6 52:10
**numb** 26:18
**number** 34:9
**nurse** 27:23 45:9
**nurses** 27:21 29:3 45:1,10
**nutty** 44:20

**O**

**objections** 7:3
**objects** 7:4,5
**occupation** 9:15
**occurred** 53:25
**office** 27:15 43:6
**officer** 16:25 17:13,22 25:9, 19 28:4,6 37:14,21 38:8, 20
**OHSU** 29:1 42:23 43:9,18 45:25 46:5,8,20 47:16
**open** 41:23 52:25 54:18
**opened** 30:17
**options** 47:25
**order** 28:18
**Oregon** 4:7 5:3
**organized** 5:17
**oxycodone** 29:5 31:13,17
**Oxycontin** 45:13,16,18
**Oxyconton** 45:15

**P**

**p.m.** 4:10 13:18, 23,25 14:2,5 27:14,16 43:10 52:13,16 55:8,9
**paid** 14:1
**pain** 29:6 31:11, 14,15,19,22
**pants** 17:10 26:4
**papers** 12:9
**paralegal** 4:18
**paramedics** 27:6 37:12,18
**park** 20:17,18, 19 48:4
**part** 30:7,8,9 43:8
**participating** 4:20
**passed** 24:18
**Pastrana** 4:4,5 5:1,11,22 52:8, 18,20
**pause** 52:9
**pay** 40:15
**paying** 40:10, 11,18,20
**Pearl** 47:14,17
**people** 9:24 10:1 15:14 16:19,21 27:5 35:10 36:22 50:20
**perpetrator** 50:9
**persisting** 39:7
**person** 6:5 17:15 25:16 26:6 27:1 39:17 45:6 50:8
**personal** 38:4
**personally** 49:21
**pharmacy** 30:12
**phone** 34:9
**physical** 46:22
**pick** 29:9,12
**picked** 6:12
**picture** 22:18, 20
**pills** 29:5 31:13 45:18
**Pine** 14:21 15:8,9,19,22 18:9 19:5 32:16 33:9,19,20
**pizza** 14:8,11, 12,16 15:8 18:11,15,23,25 19:12 20:12
**place** 14:8 18:24 19:4,12 20:12 41:7 46:2
**Plaintiff** 4:13
**Plaintiffs** 4:15
**plans** 20:3,4
**plant** 15:6
**plants** 14:24,25
**plastic** 30:6
**point** 12:4 35:19 51:1
**police** 16:25 17:12,22 25:9, 18 27:6 28:4,6 31:3 37:14,20 38:20,22 49:21, 25 50:13
**Porter** 4:16 5:6, 12 34:18 35:8 52:17 55:3
**Porter's** 35:2
**Portland** 4:5,7, 17 5:13,15 15:14 41:1,5
**position** 10:17
**positive** 51:3
**powder** 31:17
**prepare** 12:2, 15
**pressed** 7:12
**pressure** 41:12
**pretrial** 9:22,23 10:2 50:5,13
**prior** 9:6
**private** 34:22
**probation** 10:3
**problem** 7:2 8:7 29:12 35:18 48:10 50:18,20
**proceedings** 52:14 55:9
**program** 9:23 10:2 50:5,6
**programs** 10:25
**puking** 27:22, 23
**pull** 22:17 48:15 49:7
**pulled** 48:8
**punish** 50:19
**push** 29:25
**put** 5:8 7:21,22 10:1 14:24 15:6 22:20 27:7 28:1 31:17 37:18 48:19 49:2,10, 11
**putting** 47:10

**Q**

**quality** 11:2
**question** 6:7, 17,20,23,25 7:4,7 28:8
**questions** 6:16 8:14,19 13:10 35:2 38:5 49:18 52:21 53:2,9 54:17
**quick** 22:18
**quiet** 30:18 45:7

**R**

**Raleigh** 11:10, 14
**ramp** 40:16
**ran** 45:16
**reach** 25:25
**read** 12:6
**reading** 12:9 39:5
**ready** 14:4 29:19
**real** 22:18
**reality** 42:2
**realize** 25:4
**realized** 16:25 25:18 26:8
**reason** 7:16 45:20
**recall** 53:25 54:11
**recently** 39:6
**record** 4:10 5:9 7:5,16 52:11, 13,16 55:5,7
**recorded** 6:3
**Regal** 19:16
**rehab** 40:19
**release** 9:22,23 10:2 50:5,6,13, 14
**remember** 12:10 13:9,13, 15 15:19 19:13, 20,25 24:10 25:15 27:12,19 30:24 32:20 33:14,19 36:15 43:20 47:16 53:13 54:13,15
**reporter** 4:23 5:3 6:4,8,13 55:4
**Reporting** 4:24
**represent** 4:13
**representing** 5:13
**resign** 9:19
**Resilience** 51:6
**resilient** 51:5,8
**respect** 39:14
**retire** 10:11
**retirement** 40:13
**review** 12:1
**rid** 31:18 47:23 48:7
**road** 19:11 21:8
**Robin** 5:2
**room** 4:19 7:14, 23 17:4,5,20 18:4 25:21 26:10 27:18,20 29:1,23 30:1

JESUS VELEZ PASTRANA, 08/22/2025
www.LNScourtreporting.com

38:3 41:10 46:10 48:2,4
**rooms** 29:4,22
**rotation** 49:3
**route** 19:2 20:11
**run** 16:6,8 21:9 22:5,11 23:24 24:11,14,21,22, 24 27:10 28:19 31:2 32:7,10 54:2,4,9
**run-ins** 50:12

**S**

**safe** 48:21
**saline** 47:9,11
**Sally** 29:11 30:15
**Saturday** 43:13 45:16
**scene** 37:21 54:12
**school** 23:4,8
**scissors** 27:21
**screaming** 16:19,21 25:12 36:4,5,10
**screens** 38:11
**seconds** 16:9, 10 24:10,16 38:15,16 54:2
**secure** 51:22
**Security** 40:14
**sell** 41:2
**sense** 34:23,25
**set** 49:13
**share** 22:18
**sharing** 25:2 32:3 42:21 49:16
**shaving** 39:24
**she'll** 4:19
**shirt** 27:21
**shock** 26:19,24 27:4 30:10 37:16 38:23
**shocked** 36:11 37:11
**shoot** 11:4 17:18
**shot** 51:19,20
**shower** 39:23
**side** 16:1 23:5, 8,9,11 53:1,13, 14,15,16,20,21
**sidewalk** 22:16 23:25
**sidewalks** 22:13
**sign** 13:2 20:7 22:10,11
**signed** 10:19 39:6
**signs** 15:20 20:9
**simply** 8:21
**sir** 5:12
**sirens** 36:7,8
**sit** 29:21
**sitting** 31:8,20
**situation** 50:3
**Sixth** 19:17,18
**slave** 39:20
**sleep** 31:8,20, 24
**sleeping** 49:9
**slice** 18:25
**smashing** 31:16
**soaking** 17:10 26:4
**Social** 40:13
**sodium** 47:7
**somber** 30:18
**sound** 21:6
**sounds** 34:14 35:25
**soup** 33:11
**south** 15:21 54:7
**speak** 12:14 34:1
**special** 10:13
**specialize** 46:3
**spending** 40:24
**squeaking** 16:2
**standing** 25:15
**Stark** 14:9 18:12 19:7,9,12 20:18
**start** 13:9 25:24 45:4,6 47:23 48:5,6,24 51:1 52:6
**started** 8:15 15:4,8,23 21:3 31:16 32:1 39:2 45:1 47:3 48:3, 10 54:6
**starting** 4:13 39:3
**States** 4:6
**stay** 28:21,22 29:2
**steps** 15:24 23:19
**stick** 13:4
**stop** 14:22 15:16,20 20:7,9 22:10,11 25:1
**stopped** 14:20
**story** 54:19
**street** 15:9 20:5 33:9
**streets** 20:24 50:16
**stressful** 40:9
**stretcher** 27:7 37:18
**strong** 42:12 45:20
**struggling** 47:22 49:1
**stuff** 35:15 38:4 42:17
**suddenly** 17:7 21:6 22:5 24:11 26:25 28:6
**suffer** 44:12
**suffered** 8:18
**Sunday** 43:13
**supervisor** 29:10 30:11 46:25
**supposed** 13:3
**survive** 37:15
**surviving** 40:13
**SUV** 40:15
**swallowing** 7:19
**swear** 4:24 17:24 31:12
**sworn** 5:2 12:7

**T**

**taking** 10:10 31:13 39:25 42:16 46:10 47:3 54:20,21
**talk** 12:16 18:25 32:2,22 34:23 35:20 37:23 38:1,24 39:2,7 41:25 44:19,23 45:8 52:23,25 55:4
**talked** 35:9,20, 23 37:20,21 44:11
**talking** 13:9 14:15,16 16:15 20:1 21:5 22:22 24:13 30:25 32:6 34:15 35:15 36:2 41:24 44:16,17, 18 45:1 50:25
**talks** 39:6 51:16
**telling** 15:1 45:6 50:25
**tells** 26:25
**ten** 29:5
**terrible** 39:16 42:8
**testified** 5:4
**testify** 8:11 24:20
**theater** 19:13, 16
**therapies** 41:6 46:20
**therapists** 46:21
**therapy** 40:21 46:22
**thing** 22:22 30:2,20 39:9 45:15 51:23
**things** 6:11 16:2 18:7,19 28:5 34:21 36:3 49:18 50:20 52:6
**thinking** 27:8 30:19
**thought** 16:14, 22
**thoughts** 50:1
**tickets** 13:19, 21 14:5
**time** 5:10 11:14 15:11,13 18:20, 23 20:10 22:9 24:17 27:9,11, 13,16 31:7 32:4,8,11 39:15,21,22 43:3,22 44:7,8 45:11 48:16 49:10 50:21 52:20 53:1 54:20,21
**times** 18:21 19:1 45:8,11 50:14 51:14
**tires** 16:2
**today** 5:24 6:3 7:14 8:12,20 12:2,15
**Today's** 4:9
**toenails** 39:23
**told** 20:10 26:15,19,21 27:23 28:4,10, 12 29:20 30:15 34:4 37:12 38:9 46:25 49:8 51:12
**touch** 48:20
**touching** 17:8 25:24
**trach** 46:11 47:19 48:23
**Traci** 4:23
**traffic** 20:14
**transfer** 46:1
**traumatic** 46:3 48:18
**truck** 16:7,16 21:7,10,11,13, 15,19,22 22:3, 6,8 23:23 31:2 32:7,11,12,18, 19 35:24 36:13, 14,17,18,21,25 37:5,8 38:13,15 42:5 49:22 54:9
**true** 13:3
**truth** 12:8
**tube** 30:5 46:13,15 47:6, 9,11,23 48:7,8, 14,23
**tubes** 30:4 32:9 48:15
**Tuesday** 43:13
**turn** 19:7 21:21 32:12
**turned** 14:23 21:15 36:15
**TV** 8:1,2 14:3
**twisted** 30:7
**type** 6:8
**typing** 6:4

**U**

**U-HAUL** 36:17
**Uh-huh** 18:10, 13 34:17,20 36:6 51:21
**unbelievable** 21:20
**unconscious** 24:6,9
**understand** 6:13,15,20 8:18,21 9:14 13:11 18:8 31:5
**Understandable** 36:12
**understanding** 32:5

JESUS VELEZ PASTRANA, 08/22/2025

www.LNScourtreporting.com

**understood** 6:18 42:22
**unintelligible** 19:19
**United** 4:6
**unmarked** 20:6,7
**upstairs** 14:2

V

**vehicle** 54:5
**Velez** 5:1,11
**ventilator** 47:20
**ventilators** 46:12 48:23
**versus** 4:5
**Vibra** 46:2,7,8
**video** 4:3 6:6
**videoconference** 4:11
**videoing** 6:5
**virtual** 7:9
**volume** 8:2

W

**wait** 6:22,23,24 44:3,5 50:18
**waiting** 13:23
**wake** 41:25
**waking** 48:10, 17
**walk** 12:17 14:12 18:17,22, 23 19:4 20:21 30:14 53:21
**walked** 14:19 17:13 38:2
**walking** 15:8, 23 17:16 21:4 26:6 27:17 32:17 42:7 53:13
**wall** 44:18
**Wallace** 4:14 34:11,14,18,21 35:1,6 53:2,6 54:16,24
**Wallace's** 35:19
**wanting** 39:7
**watch** 30:20
**watching** 8:2 14:3
**water** 47:9,11
**waterfront** 43:9
**ways** 15:12 21:3 23:15
**we-** 33:2
**we--** 30:13
**Wednesday** 43:4,11,13
**week** 18:21 44:6 46:7
**weeks** 44:6 46:22 51:23
**wet** 17:11 26:4
**wheelchair** 29:21,25 48:12
**when's** 27:11
**white** 16:7,16 49:22 54:9
**wipes** 40:11
**witnesses** 35:10
**woke** 25:5,7
**word** 51:7
**work** 9:17 11:1, 6 27:15 46:17 47:1 50:15
**worked** 11:9
**workers** 15:4
**working** 9:22 11:7,8 13:24 50:4
**worry** 17:14 26:5
**worse** 26:19,21 39:9
**worst** 30:2,8

Y

**years** 11:4,5 13:7 39:11 40:4 41:9
**yelled** 54:4

Z

**Zoom** 4:11

JESUS VELEZ PASTRANA, 08/22/2025



www.LNScourtreporting.com

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | | |
|---|---|---|
| JESUS VELEZ PASTRANA and JOHN G. IRWIN, JR., Plaintiffs, vs. CITY OF PORTLAND, a municipal corporation; JOSEPH GARY SUMNER, an individual; SHAUN LEE PALMER, an individual; and JOHN or JANE DOE, an individual, Defendants. | ) | 3:24-cv-00587-AB |

VIDEO-RECORDED DEPOSITION OF JOSEPH GARY SUMNER

Taken on Behalf of Defendant City of Portland

February 20, 2025

BE IT REMEMBERED that, pursuant to notice and the Federal Rules of Civil Procedure, the deposition of JOSEPH GARY SUMNER was taken before Susan G. Walker, an Oregon Certified Shorthand Reporter, on Thursday, the 20th day of February, 2025, commencing at the hour of 9:00 a.m.; the witness responding to questions via videoconference from Ontario, Oregon; the questions propounded and proceedings reported remotely via videoconference.

street. That's for sure. And what happened was the truck was T-boned, and it wobbled and hit a bunch of cars on the side. And when it stopped wobbling and stopped, I opened the door, and I Tom Cruised it, so to speak. Tom Cruise will be playing the role of me. Okay? There's no doubt. 10:53:18

No, that's not even funny. It's not okay. I'm not trying to joke here. I take this seriously.

Q I think sometimes, Mr. Sumner ----

A And I'm being held accountable, and those cops, you know, they were doing their job, you know. They were 10:53:39 doing their job.

I love the City of Portland, and I know, like, -- so I seen -- what I would do was, I would slow down. If you look at the video from Air 1 you'll see that every time there was a stop sign I wasn't just blaring through 10:53:57 them, like, unconsciously. I was like, okay, you know, I didn't want to get in an accident. I felt like I was a really good driver. I learned to drive in northern Michigan when I was 15 years old in an IROC-Z in the snow. So I really didn't ever believe that something like that 10:54:18 could happen.

So the thing about the victims is that I had never seen them before or after. So I still don't under-stand scientifically how that happened and whether it was the truck, because I know that when I pled guilty that day 10:54:34

strips? I think we call them spike strips. Is that what you're referring to?
A Yeah.
Q Did you notice whether they got underneath the truck as you drove by. Did you see if they impacted the truck at all? 11:02:03
A I wasn't sure.
Q Okay.
A I wasn't sure. I assumed I ran them over, and that maybe the tire didn't pop maybe. 11:02:16
Q So between the time that you left Tom's Bar and the time you abandoned the truck, did the vehicle drive as if it had a flat?
A Did what?
Q Did the vehicle feel like it had a flat? 11:02:32
A No.
Q Did you feel like it was harder to slow down or turn at all than it had been?
A No, I really didn't.
Q All right. So you also said that you saw SUV's that were police cars. Is that because -- were they marked police cars? 11:02:47
A Yes.
Q Okay. So you could see that the police were in the area. 11:03:00

A Yeah. I seen that they -- and I knew that, like, they were looking for me.

Q Did they have their lights on, their overhead lights?

A No. The one was like -- there was one, he was parked, and he was, like, standing in front of his -- standing in front of his SUV. I mean, if my memory serves right, I'm pretty sure that's what. And that was where I decided to turn right and go towards Hawthorne. The whole time I was just trying to find any spot to park and just jump out of the truck and get out and run on foot, you know. 11:03:13 11:03:33

Q And you don't need to talk about the specifics, but it sounds like you'd done this a few times before.

A I had been in a situation, in a few situations, yeah. And, like, when I was on meth my instant reaction was always just to run. And whenever they catch me I'm always very -- I would always be very cooperative with them. I would say, hey, you know, hey, I'm not trying to -- you know. 11:03:49 11:04:07

Q It sounded like you had a plan. So head to the neighborhood. That was part of the plan?

A And just get out and run. My only plan really, you know, I really couldn't really plan it out. It's, like I said, when neurotransmitters react, it's like there 11:04:20

is no thought process. There's just, like, okay, go. And then, like, okay, pull into the neighborhood and get out, you know. And so my plan really was just ultimately just to get out of the truck and run, if I could.

Q I appreciate that. It sounds like you were just looking for a place where you didn't see police to do that. 11:04:38

A Yeah.

Q And so when that didn't happen, you were looking for a supermarket or someplace where there was a lot of people to disappear into, that you mentioned Safeway? 11:04:53

A Yeah. Like, well, you know, by the time I got over there I remembered that -- I was like, okay, we're by the Safeway, maybe we can park by the Safeway and just run in there and eat lunch like we belong here, you know, or something like that, you know. 11:05:10

Q Okay.

A Or jump on a bus. Basically I wanted to jump on the bus when I get closer to Hawthorne.

Q Yeah. Which Safeway are we talking about? Do you remember where it was located? 11:05:23

A On Hawthorne. Safeway on Hawthorne.

Q By 39th. Sorry. Go ahead.

A About 26th or so. 20-something and Hawthorne.

Q And why didn't that work out?

A I seen a couple police vehicles in between, 11:05:35



www.LNScourtreporting.com

between Tom's Bar and that point.

Q Okay. And so then I know these weren't, like, pre-planned. You explained that it's more instinct because of the way that meth works. But try to find a bus or a place where there weren't police, and run from the truck or get on a bus and get away. That was the next ---- 11:05:52

A Any quick route out. Any way to just get out of this truck and not be in it, you know. Because at that point it's like the truck is the magnet. Just get out of it, get away from it. Just get away. 11:06:07

Q And so I want to make sure I have the timing right. When you realized that none of those plans were going to work and you said to the two people in the truck, good luck, is that what you said? 11:06:25

A Pretty much. I said, hey, I'm going to stop the truck. You know, we're stopping. You know, I'm trying to stop right now, because, the guy, you know, he was freaking out. He was like, you know -- he was like, hey, man, come on, man, you know. I was like, don't worry, we're stopping right now. And I was like, are they still back there? He was like, yeah, they're back there. 11:06:40

Q That was before you came to the intersection where you were hit that that conversation took place?

A That was right, you know, probably a few seconds 11:06:59



www.LNScourtreporting.com

before that. Because as I was pulling through that neighborhood along about 26th, I want to say 26th, and the tree streets like Elm and Pine and Oak, so to speak -- I'm not sure which one it was -- I would slow down almost to a stop, and then I would accelerate a little bit. I was trying to find somewhere to park anywhere on that street and just get out and run, you know. 11:07:20

But I wanted to -- actually, as I remember, I wanted to make it as close to Division as I could. I knew where I was. I remembered that there were bus stops and, like, there were a lot of people that would be eating lunch, and I could just get out and just kind of try to just get away, you know. 11:07:38

Q Yeah.
A I just wanted to get away. 11:07:56
Q So you had that conversation. Do you remember trying to -- you described how you'd slow down and then look for a place to stop at each stop sign. Did you feel like you did that at that last stop sign before you were hit? 11:08:10
A I was trying to stop the whole time. I mean, the whole, the entire trip from Tom's Bar, I mean, all I wanted to do was just get out. That's all I wanted to do, was get out of that truck.
Q You said you didn't see the plaintiffs ever. 11:08:27



www.LNScourtreporting.com

Did you see the car that hit you?
A I believe I did. I believe that, you know, as I was going through, it was going pretty slow. I wasn't going really fast. I know that I was almost to a stop, but the weight of the truck and the fact that it had any motion at all, when it hit the back end, the truck wobbled. 11:08:47
So I believe that I did see it. I believe I did. And I did my best to avoid it. And then the truck just clipped, like, right around -- I want to say it felt like probably like right between the back tire and the bumper, is where it feels like it hit, I want to say. 11:09:05
Q Okay. And, again, I'm just asking what you remember, Mr. Sumner. So that's good enough for me. Thank you. And if you remember things, as you've done, just feel free to add them back and go, oh, I remember this or I remember that. 11:09:23
So it sounds to me like you saw the car that hit you after you were in the intersection; not before.
A I saw the car basically at, you know, as it was -- I really -- I can't answer that honestly. 11:09:40
Q Okay.
A I can't answer that and be honest because, I mean, I'm rolling my eyes thinking here, like, you know. I believe that -- I mean, I would have to -- if you looked 11:09:57



www.LNScourtreporting.com

A I did. I seen a few, I want to say two -- at least two times I recognized police vehicles. One time he was just parked, and he was, like, I want to say, just in front, standing in front of his vehicle. And that was just in the residential area between, you know, I would 11:11:44
say probably about around 30th and somewhere halfway between Division and Hawthorne. You know, somewhere in that area, in those few streets, I noticed one. And then I noticed another one when I was at, not Hawthorne, the next one down, the next main road. I noticed that there 11:12:10
was an officer. And he had his lights on. And that's when I went up the hill.

I was a little reckless at that point with driving through that intersection, which was at that point I was just like, look, I was just trying to get out. And 11:12:26
my passenger was like, look, man, we need to stop, just please, you know. I was like, don't worry, we're going to make it, you know; we'll get out of this somehow, you know.

Q So there was one officer that had his lights on. 11:12:40
And you saw a couple other patrol cars during this time. Is that correct?

A Well, the officer that I seen between Division and Hawthorne, I don't believe his lights were on. I don't believe it, though. I could be wrong. I could be 11:12:59

wrong. I mean, this was, like, really fast. But I believe he was out of his car, and he was just kind of, like -- kind of like -- and I knew that he was waiting for me, you know. Or I felt like he was. I can't, you know, guarantee. But I do believe that, you know, he was going 11:13:22 to, you know, try to.

So I made a turn, and I didn't see him behind me. And then when I got up to the next main road past Hawthorne, I remember going through Hawthorne. I want to say that I -- but I know that whatever the main road is 11:13:40 just past Hawthorne, I know I was going really fast. And at that point it became slightly reckless.

And then when we got to Stark I was like -- I can't remember if I noticed any at Stark or not. But I knew -- I felt like when I reached Stark that I was almost 11:14:05 away, that I had pretty much -- that they stopped chasing. There was this rumor or something that after so many blocks they won't chase you. And they weren't really chasing me. They were just, I believe, just, you know, they just wanted me to stop, you know. 11:14:29

Q So how long after that point where you believe they didn't chase any more did you get hit?

A How long what? Sorry about that.

Q Sorry. I can ask it a better way. You said I got to a certain point and I was like, they're not chasing 11:14:46

CERTIFICATE OF REPORTER

I, SUSAN G. WALKER, an Oregon Certified Shorthand Reporter, Registered Professional Reporter, and Federal Certified Realtime Reporter, hereby certify that JOSEPH GARY SUMNER appeared via videoconference before me at the time and place set forth in the caption hereof; that at said time I reported by means of machine shorthand all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were transcribed by me personally, and that the foregoing pages constitute a full, true and accurate record of all such testimony adduced and oral proceedings had, and of the whole thereof.

I further certify that review of the transcript was waived.

WITNESS my hand at Portland, Oregon, this 3rd day of March, 2025.

SUSAN G. WALKER, FCRR, RPR
Oregon CSR No. 90-0195
Expires 9/30/2026




EXHIBIT 18
Declaration of Michael K. Porter
Page 1 of 1